[Civ. No. 5981. First Appellate District, Division Two.—December 2, 1927.]

IDA WRIGHT JONES, Appellant, v. EXPRESS PUBLISHING COMPANY (a Corporation) et al., Respondents.

248

Halverson & Price for Appellant.

Anderson & Anderson for Respondents.

THOMPSON (R. L.), J., *pro tem.*—This is an appeal from a judgment of nonsuit rendered at the close of plaintiff's case, in an action for libel. The plaintiff claims that the nonsuit was erroneously granted, since she had proved a *prima facie* case by showing that the published language which charged her with unchastity was libelous *per se,* and that under such circumstances the law presumes malice and casts the burden on the defendants to show an absence of

actual malice. Respondents assert that the evidence shows that the alleged libelous language was privileged, and that the charge therein contained was true.

The defendants were jointly charged with libel in the publication of alleged false and malicious statements concerning the character of plaintiff which were made in the "Los Angeles Evening Express" on May 13 and June 2, 1922. Separate answers were filed, one by the defendant Woolwine and the other by the remaining defendants jointly. At the close of plaintiff's case a nonsuit was granted as to all defendants. Pending the appeal the defendant Woolwine died and the action survives only as to the remaining defendants. The Express Publishing Company, F. W. Kellogg and Edward A. Dickson were publishers of the "Los Angeles Evening Express," a daily newspaper of general circulation having a subscription list of some fifty thousand readers in and about the city of Los Angeles. At the time of the publication of the alleged libelous matter the defendant Woolwine was district attorney of Los Angeles County, and plaintiff was his deputy, having charge of the investigation of juvenile offenses. The district attorney sought to discharge her by letter, but she refused to acknowledge his authority to do so without confirmation by the Los Angeles County Civil Service Commission, to which she appealed for vindication. During a public investigation of the affair by this commission plaintiff voluntarily made admissions of her guilt of the material portions of the alleged libelous publications. The publishers of the newspaper were entire strangers to the plaintiff and no express malice was shown.

The record in this case discloses a state of affairs with relation to the personal association of the defendant Woolwine and the plaintiff which, if true, would have justified the dismissal of both as unfit to hold their respective offices. Dissension arose between them. May 2, 1922, Mr. Woolwine sent the following letter to plaintiff:

"You are hereby discharged from the position you now hold in the district attorney's office, that of juvenile investigator, for the good of the service. It is my usual custom to allow employees who have forfeited a right to hold their positions in the district attorney's office to resign, but after

a consideration of all the circumstances, I do not deem that you are entitled to this courtesy.

"Yours very truly,
"THOMAS LEE WOOLWINE,
"District Attorney."

On the same date he addressed a communication to the Civil Service Commission pursuant to the requirements of section 34, subdivision 13, of the charter of Los Angeles, which read as follows:

"This is to advise you that I have discharged Ida Wright Jones, an employee of the district attorney's office. Her dismissal was embodied in a letter of date May 2, 1922, a copy of which I enclose.

"In accordance with the provisions of subdivision 13 of section 34 of the charter, I give my reason for such action as follows:

"It was communicated to me by one of the employees of the district attorney's office, that Miss Jones had stated to him that she was going to make an affidavit to the effect that she had been intimate with me, and that she was going to sell this affidavit to my political enemies for the sum of $10,000 and then leave the state. Upon verifying the fact that she made such a statement and that she had planned to take such action, I immediately discharged her.

"Very respectfully,
"THOMAS LEE WOOLWINE,
"District Attorney."

Subsequent to the delivery of these letters the plaintiff demanded and secured a public hearing before the Civil Service Commission, and on May 17, 1922, her deposition was taken in shorthand at great length, and with minute details she voluntarily confessed to a continuing course of sexual intimacies with the district attorney, extending over a period of several years, and resulting in a miscarriage on one occasion, and the performance of an illegal operation upon her, at another time. She also admitted that she had consulted with her attorney and that she had made an affidavit concerning this illicit relationship, which affidavit she alleged was solely for her own protection, and denied that it was made for the purpose of selling it to his enemies.

This conflict between the district attorney and the plaintiff led to several conferences. It was a common topic of conversation about the courthouse and in political circles, and was known to the reporters of the public press. An investigation of the truth of these stories was made by the reporters of the "Los Angeles Evening Express." Several interviews occurred between the reporters and the defendant Woolwine, and a request was made of him to furnish a true statement of the facts, in response to which he provided the newspaper reporters with copies of the two letters above quoted, together with a written statement concerning the affair. Plaintiff immediately learned of the district attorney's letter to the Civil Service Commission, and of its contents. She did not deny the charge of unchastity. Indeed, she subsequently admitted the truth of this charge. There was good reason for the reporters to believe that the charge of unchastity was true. It was therefore in perfect good faith that these two letters together with excerpts from the district attorney's written statement with explanatory headlines was, on May 13, 1922, published in the "Los Angeles Evening Express." The material portion of this newspaper article was true. The plaintiff subsequently confessed her unchastity. ■ While, in a public investigation before the Civil Service Commission, she was contesting the authority of the district attorney to discharge her, she will be estopped from denying that she was in fact a public officer so as to relieve her from the application of the doctrine of privileged communications. The occasion rendered the communication privileged under the circumstances.

It is unnecessary to quote the entire newspaper article. The gist of this publication was found in the first paragraph, as follows:

"A plot to ruin him through charges of immorality was made today by district attorney Thomas Lee Woolwine in a letter to the county civil service commission announcing he had discharged Ida Wright Jones, an investigator in his office. The district attorney alleged that Miss Jones had tried to sell to his political enemies for $10,000 a false affidavit in which she claimed to have had intimate relations with him."

The complaint contained two causes of action. The first count was based upon the newspaper publication of May

13th. The innuendo of this language was alleged to be that, "defendants meant thereby, and that it was so understood by those who read that article, that the plaintiff had made a false affidavit and had tried to sell said false affidavit to the political enemies of the defendant Thomas Lee Woolwine for $10,000, and further that the plaintiff had falsely and dishonestly entered into a plot to ruin said defendant, Woolwine."

The second cause of action consisted of a charge of libel in the publication of the newspaper article of June 2, 1922, composed chiefly of quotations from the district attorney's statements in which he severely criticised the Civil Service Commission, and the individual members thereof, for their manner of investigation and their disposition of his attempt to dismiss the plaintiff from his employ together with a reiteration of his claim that plaintiff had threatened to sell her affidavit to the enemies of the district attorney, in which affidavit she claimed to have had intimate relations with him. This article also commented upon the evidence adduced at the investigation of the Civil Service Commission, and quoted from Chairman Burger as follows: "We have taken a lengthy statement from Miss Jones in the presence of witnesses, in which she gives dates and places of misconduct and the names of witnesses. We have established that an illegal operation was performed in January, 1921. . . . The question of the discharge of Miss Jones has paled into insignificance. . . . Her own communication shows that she is no fit person to be in the employ of the county. . . . With such charges involving a public officer, this matter has gone beyond the province of the civil service commission, and should be taken to the grand jury."

The innuendo of the language of this second cause of action was alleged to be that "defendants meant thereby, and that it was so understood by those who read said article, that the plaintiff was an unchaste, immoral and evil woman, and that the plaintiff was at said time a prostitute."

█ It is evident from the innuendo employed with respect to both causes of action that the gravamen of the entire complaint is a charge that the defendants had falsely accused the plaintiff of unchastity.

Having formally declared her construction of the alleged libelous language by the use of specific innuendo, the plain-

tiff will be bound by her interpretation except where the language has a clear and obvious meaning independent of any explanation. (Gatley on Libel and Slander, p. 474; Newell on Libel and Slander, 4th ed., 599, secs. 546, 547; 16 Cal. Jur. 88, sec. 57.) The last citation quoted approvingly from *Mitchell* v. *Sharon*, 51 Fed. 424, which said: "When the plaintiff by innuendo, puts a meaning upon the language uttered, he is bound by it, although the interpretation he chooses may be such as to destroy his right of action." In the instant case, while much of the language employed is clear and requires no explanation, the purport of the entire publications is a challenge to the chastity of plaintiff, and a denial of her fitness for the office which she held. It is true that in the first cause of action plaintiff does complain of an alleged charge that she had planned to sell to the enemies of the district attorney a false affidavit, but the alleged falsity of this affidavit referred only to her lack of chastity. Certainly, if the affidavit were otherwise true, and the plaintiff admitted her lack of chastity, then the affidavit was not false, and an action for libel would not lie, based upon a charge that she threatened to sell her own affidavit which in fact declared the truth respecting her own character. The only other specific charge complained. of in the innuendo was that the defendants accused plaintiff of falsely and dishonestly entering into a plot to ruin the defendant Woolwine. The nature of this alleged plot is not revealed. Neither the pleadings nor the evidence disclose any facts upon which the charge of such a plot was founded. ▇ With respect to her chastity, the deposition of plaintiff before the Civil Service Commission leaves no room for doubt. She freely admits the truth of this charge and condemns herself. By this confession she acknowledges her own unfitness for the office which she held, and she may therefore not be heard to complain of the publication of facts regarding her character, which, in a public investigation respecting her fitness for office, she admitted to be true, even though this confession was made subsequent to the first publication. In retaliation for the district attorney's effort to discharge her from his service, she confessed her shame for the evident purpose of punishing him. Harmful as this may have been to her reputation, she must be deemed to have anticipated the result of a public con-

fession amounting to an acknowledgment of unchastity. In *Kenyon* v. *Hartford A. & I. Co.,* 86 Cal. App. 269 [260 Pac. 952], it is said: "The general rule of law is that whoever does an illegal or wrongful act is answerable for all the consequences that ensue in the ordinary and natural course of events, though those consequences be immediately brought about by intervening agents, provided such agents were set in motion by the primary wrongdoer, or provided those acts causing the damage were the necessary or legal consequence of the wrongful act. The publication was such a natural, usual, and ordinary consequence" of the act of publicly admitting her lack of chastity in an investigation of her fitness for her office, that its publicity "must be deemed to have been contemplated." (*Filer* v. *Smith,* 96 Mich. 347 [35 Am. St. Rep. 603, 55 N. W. 1002] *Burke* v. *Watts,* 188 Cal. 118, 127 [204 Pac. 578]; *Ray Wong* v. *Earle C. Anthony, Inc.,* 199 Cal. 15, 18 [247 Pac. 894].)

"Libel is a false and unprivileged publication . . . " (Civ. Code, sec. 45.) The communication in the instant case was neither false nor unprivileged. ■ Certainly a newspaper cannot be held liable for damages for the publication of a communication without malice, concerning the fitness of one for a public office, which statement is voluntarily admitted by the accused to be true. But the appellant denies the application of the principle respecting privileged communications, for the reason that she was no longer a public officer, having been previously dismissed by her employer. While it is true that the letter of dismissal had been sent to her the same day on which a copy was delivered to the reporters, she refused to acknowledge the authority of the district attorney to discharge her without the confirmation of the Civil Service Commission. At the very time of the publications complained of she was engaged in resisting her employer's efforts to dismiss her. The question of the truth of these charges and of her fitness for the position which she held was then an issue before the commission and not yet determined. Under such circumstances, for the purpose of the application of the principles respecting privileged communications, she must be deemed to come within the classification of public officers.

Privileged communications are defined in section 47 of the Civil Code as follows: "A privileged publication is one

made . . . (3) in a communication, without malice, to a person interested therein, by one who is also interested, or by one who stands in such relation to the person interested as to afford a reasonable ground for supposing the motive for the communication innocent, or who is requested by the person interested to give the information. . . . ''

██ The appellant contends that since the language of the challenged publications was libelous *per se*, they were not privileged, but, upon the contrary, were presumed by law to be malicious, and that the burden of proving an absence of actual malice rested upon the defendants. In support of this assertion, the case of *Stevens* v. *Storke*, 191 Cal. 329 [216 Pac. 371], is cited. That case was an action for libel against the editor of ''The Daily News'' of Santa Barbara, on the part of a private citizen. No question of the fitness of a public officer was there involved. So, also, the entire group of authorities cited in appellant's brief in support of the principle that a newspaper report which imputes to a person grave offenses or discloses conduct which will expose one to contempt and disgrace, is libelous *per se*, have reference to false charges against private individuals, and not against public officers. Quite a different rule prevails with respect to fair criticism of the necessary qualifications of a public officer.

The doctrine of privileged communications rests essentially upon public policy. Under proper circumstances the interest and necessities of society become paramount to the welfare or reputation of a private individual, and the occasion and circumstances may for the public good absolve one from punishment for such communications even though they be false. (Newell on Libel, 340, sec. 341.) ██ It is the settled law of this state that one who relies upon the doctrine of privileged communications as a special defense, must adequately plead the facts. (*Stevens* v. *Snow*, 191 Cal. 58, 64 [214 Pac. 968].) This was done in the instant case. It is true that where the facts do not constitute a privileged communication, and the language is libelous *per se*, the law implies malice, and the burden is then upon the defense to prove a lack of actual malice. (*Stevens* v. *Storke*, *supra*.) The burden is also upon the defendant to prove any affirmative defense upon which he relies, including the defense of the truth of the charge, or that the communication is privi-

leged. But when the pleadings admit, or the evidence on the part of the plaintiff affirmatively establishes such facts, manifestly the defendant is thereby relieved of this burden. In Gatley on Libel and Slander, at page 280, it is said: "When a defense of qualified privilege is set up, it is for the defense to allege and prove all such facts and circumstances as are necessary to bring the words complained of within the privilege, unless such facts are admitted before or at the trial of the action." When essential facts are not disputed, the question as to whether the communication is privileged, is solely a question of law for the determination of the judge. (Newell on Libel, 382, secs. 345–347; Gatley on Libel, 280–284, 650; *Dauphiny* v. *Buhne*, 153 Cal. 757 [126 Am. St. Rep. 136, 96 Pac. 880].) "It is exclusively for the judge to determine whether the occasion on which the alleged defamatory statement was made, was such as to render the communication a privileged one. . . . If, taken in connection with admitted facts, the words complained of are such as must have been used honestly and in good faith by the defendant, the judge may withdraw the case from the jury. . . . " (Newell on Libel, 383, sec. 345.) And when the facts clearly constitute a privileged communication even though the language employed under other circumstances might be slanderous *per se*, the very privilege creates a presumption that the communication is used innocently and without malice. (Newell on Libel, 381, sec. 342; Jones on Evidence, 3d ed., 34, sec. 29.)

A newspaper stands in the same class as an individual so far as the application of the principle of privileged communications is concerned. In the case of *Snively* v. *Record Pub. Co.*, 185 Cal. 565 [198 Pac. 1], it is said: "A newspaper stands in the same relation to the people of the community in which it is published and circulated, that with regard to publications therein concerning public officers, it comes within the scope of that part of subdivision 3 (Civ. Code, sec. 47) requiring a reasonable ground for supposing the motive for the communication innocent, if the matter published has the other characteristics of a privileged communication." The appellant, however, contends that where the language is libelous *per se*, even though it is applied to a public officer, innocent as the motives may be, malice is implied, and it will not be privileged. In support of this

assertion appellant relies upon the cases of *Jarman* v. *Rea,* 137 Cal. 350 [70 Pac. 216], and *Dauphiny* v. *Buhne, supra.* Both of these cases, however, have been overruled by the Snively case, *supra,* so far as they seek to limit the application of the doctrine of privileged communications. The opinion in the Snively case is authority to the effect that proof of circumstances which characterize a communication as privileged under the provisions of the Civil Code, section 47, completely refutes the presumption of malice, even when the language is libelous *per se.* The statute provides that the very relationship existing between the publisher of the alleged libelous matter and the interested parties may afford reasonable grounds for supposing the motive for the communication to be innocent, and, therefore, privileged.

In the instant case the proof seems conclusive of the absence of malice on the part of these respondents. The appellant was an entire stranger to the publishers of the newspaper. It was their business to disseminate news. The question of the fitness of a county officer was involved. Good moral character is peculiarly essential to an officer whose duties require her to supervise juveniles in the plastic years of their lives. The public was vitally interested in knowing the character of such an officer. No possible reason for malice on the part of these respondents was shown. Under such circumstances the mere presumption of malice will be refuted. Moreover, when a communication is clearly privileged, the question of the truth or falsity of the charge is not necessarily involved. It may be privileged even though the communication is false. The truth of a published communication is a complete defense to a charge of libel in itself. The claim of privileged communications under the statute is a defense entirely independent of the question of the truth of the charge.

It is not only the privilege but the duty of every citizen and every newspaper in the community to fairly and impartially criticise the faults and misconduct of public officers, which faults impair their fitness or usefulness for the office which they seek or hold. So long as this is done in good faith and without malice it is not libelous. In this regard the opinion in the Snively case, *supra,* says: "Since the conduct of public officers is a matter in which every citizen of the community in which they serve is interested, the pub-

lication, . . . if otherwise privileged, must be considered as one made to persons interested. . . . There are some decisions which hold that a communication concerning a public officer which is not made to those having the power of removal or of appointment, but is made to the public generally, is not privileged. We are of the opinion, however, that this rule should not be followed. . . . Communications made in good faith and without malice to the public generally respecting the conduct of such officers come within the spirit and purpose of the statute regarding privileged communications. They tend to promote knowledge concerning such officers and give citizens a basis for their petitions (for election or removal)." So, also, in Gatley on Libel, at page 224, it is said: "It is the highest importance that none but persons of good character should be elected to public office. If a citizen honestly believes that a candidate for public office has committed an offense (or is unworthy or unfit for public service) . . . he is under a moral duty to society to communicate the facts as he believes them to exist, . . . and if he does so without malice, his communication will be privileged." This principle manifestly applies not only to candidates for office but to incumbents as well. Nor is the rule different with respect to appointive officers. Better service may be expected from public officers who are conscious of the watchful eyes of their constituents.

The appellant charges error on the part of the trial court in sustaining an objection to the following question: "It is stated in this article of May 13th, 1922, that according to attaches of the district attorney's office who investigated the case, Miss Jones made charges of intimacy against four other prominent men of Los Angeles, one of them a city official, one of them a state official, the third a doctor and the fourth a lawyer. I will now ask you whether or not you made such a statement to any person?" Respondents' objection to this question was sustained on the ground that appellant was bound by her construction of the language as indicated by her innuendo. This statement was a mere aggravation of the former charge of unchastity. If it were true, it would merely mean that she was more common and promiscuous in her sexual indulgences than she had admitted. When one is accused of unchastity and admits the charge, a court will not indulge in critical distinctions to

determine just what degree of profligacy the accused has attained. This ruling was therefore not prejudicial error.

■ The appellant also complains of the unwarranted extent to which respondents were permitted to range in cross-examination of her witnesses. But scant evidence is printed in her briefs, and the court's attention is not called to any fact thus elicited which appears to have been prejudicial to her cause. Error which does not prejudice the substantial rights of the appellant will not suffice to reverse the judgment. (2 Cal. Jur. 1004, sec. 595.) ■ The gist of the alleged libelous publications was imputed lack of chastity on the part of appellant. She claimed that the respondents had falsely charged her with unchastity. Her deposition taken in a public proceeding before the Civil Service Commission, acting in a *quasi*-judicial capacity, contained her sworn statements amounting to admissions of her own unchastity, together with circumstances which characterize the publications as privileged. The use of this deposition on cross-examination was therefore competent and proper.

■ This appeal was perfected under the provisions of section 953c of the Code of Civil Procedure. Very little evidence was printed in appellant's briefs. Substantially all that appears in her opening brief is a bare record of the publication of the alleged libelous language. Because this language charged unchastity, and was libelous *per se,* it was assumed that it implied malice, and that proof of its publication constituted a *prima facie* case. But the original transcript of evidence, containing 425 pages, discloses satisfactory proof of the truth of the alleged libelous language, and of circumstances which rendered it privileged. After a nonsuit is granted, every presumption is in favor of the judgment. (2 Cal. Jur. 884, secs. 519, 520.) When one seeks on appeal to reverse a judgment, the burden is upon the appellant to show that it was improperly granted, and a full and fair record of the evidence applicable to the points relied upon by appellant should be printed in the briefs. "It is not a compliance with the procedure governing appeals under the so-called alternative method, for an appellant to print in his opening brief, or in the supplement thereto, only the testimony in the case favorable to his contentions. All the evidence material to the point

made on the appeal should be presented in order that the court may consider its weight and sufficiency, and any conflict presented therein. . . . '' (*Eddy* v. *Stowe,* 43 Cal. App. 789, 792 [185 Pac. 1024].) The appellate court is not required to assume the vexatious burden of searching the typewritten record for error. (2 Cal. Jur. 645; *Scott* v. *Hollywood Park Co.,* 176 Cal. 680 [169 Pac. 379]; *McLaren* v. *Hards,* 39 Cal. App. 104 [178 Pac. 332].) In the instant case a judgment of nonsuit was granted on the theory that the plaintiff's case showed that the alleged libelous matter was both true and privileged. Where there is no pretense on the part of appellant to conform to section 953c of the Code of Civil Procedure, to print a fair summary of the evidence applicable to the points relied upon, this court will assume that the record amply supports the judgment. The burden placed upon the appellate courts, with the multitude of appeals which are now pending, is too onerous to permit a search of voluminous records to ascertain whether the judgment is supported by substantial evidence.

The judgment is, therefore, affirmed.

Koford, P. J., and Sturtevant, J., concurred.