[Civ. No. 12835. Third Dist. May 18, 1971.]

GENE ARTHUR WHITE, Plaintiff and Appellant, v.
THE STATE OF CALIFORNIA et al., Defendants and Respondents.

622

## COUNSEL

Fields & Klein and Rodney A. Klein for Plaintiff and Appellant.

Thomas C. Lynch and Evelle J. Younger, Attorneys General, and Thomas K. McGuire, Deputy Attorney General, for Defendants and Respondents.

## OPINION

**REGAN, J.**—Plaintiff brings this action for damages against the State of California and certain designated employees and agents thereof, acting through the Department of Justice, Bureau of Criminal Identification and Investigation (hereafter referred to as Bureau), alleging that the Bureau negligently posted to plaintiff's record, and negligently disseminated and published erroneous information relating to plaintiff. After plaintiff's opening statement the court granted defendants' motion for a nonsuit. Plaintiff appeals from the judgment.

There having been no objection raised to the statement of facts as set forth in defendants' brief, we adopt the same as the true statement of facts herein.

Plaintiff was arrested, made a ward of the juvenile court, and placed on probation for grand theft auto in San Diego in 1939. As indicated by a 1951 letter from a Merced Police Department inspector, Robert L. Kellerer, in 1941 plaintiff had been identified from a photograph as the person who had passed a forged check at a Merced chain store. The photograph of plaintiff was obtained by Merced from the San Diego Police Department bearing its identification number 12356.

At some time after August 4, 1941, a notation was added to plaintiff's record at the Bureau, which stated as follows: "8-4-41. Merced P.D. Eugene White, wanted, fictitious checks. 'Rep. 285.' Subject is in El Reno, Oklahoma. Due to small amount involved, D.A. will not extradite. Still wanted if apprehended in California. L.E.T. 8-15-41." In addition, the following aliases were added to plaintiff's record: "Enos White," "Norman Railton," "Victor Kemp," and "J. B. Cabral." Presumably, these were the names used on the fictitious checks.

In 1951, as a result of plaintiff's application to the National City Police Department for a police officer's position, the Bureau notified the Merced Police Department that plaintiff was in National City. Inspector Kellerer of the Merced Police Department replied as follows: "Reference is made

to your letter of September 1951 relative to Eugene White who was wanted by this department for passing of fictitious checks in 1941. Upon review of this file, I find that suspect had been identified from a photograph as the person who had passed a forged check at one of the local chain stores. However, no complaint was apparently filed against him as he was known to have left the state. As a result, due to the statute of limitations, this department has no further hold on this subject.

"A copy of the photograph of Gene Arthur White, San Diego P.D. 12356, is enclosed herewith for your files. A copy of this letter, as well as photograph, is being forwarded to Chief of Police, National City. Thank you for your information."

In 1962, in connection with the employment of plaintiff by the Clovis Police Department, the Clovis police chief, Thomas Higgason, after having received the arrest record of plaintiff from the Bureau, wrote the Bureau as follows: "Dear Sir: The subject enclosed states alias names are false. Would you check once again and send the information to us as soon as possible. CII 629212. Eugene Arthur White. Thank you for your attention. Very truly yours, Chief of Police."

The Bureau replied as follows: "October 9, 1962. Dear Chief: This Bureau has received your recent inquiry concerning Eugene Arthur White, CI&I 629212. Attached is a photostat of a fingerprint card of the subject, showing alias names as reported to this Bureau. If we may be of any further assistance in this matter, please do not hesitate to communicate with us. Yours very truly . . . ."

In 1967, plaintiff went to the Bureau seeking to examine his record as he believed it contained erroneous information. He was shown his file, and he denied that the record was his. He was advised by the Bureau that if information in the file was incorrect he should have the agency which submitted the information so advise the Bureau; that the information would not be deleted solely on his claim that it was false.

In 1967, at plaintiff's request for assistance, the Governor and others advised plaintiff to go to the Bureau to have the matter looked into, and Assemblyman Zenovich's office inquired into what the record contained in an attempt to assist plaintiff in his claim that the record was incorrect.

Before turning to the merits of this appeal, we note the following code provisions relating to the duties and responsibilities of the Bureau:

"The Attorney General shall exercise absolute control and management of the bureau." (Pen. Code, § 11005.)

"The Attorney General shall procure from any available source, and file for record and report in the office of the bureau, all plates, photos, outline pictures, descriptions, information and measurements of all persons convicted of a felony, or imprisoned for violating any of the military, naval, or criminal laws of the United States of America, and of all well-known and habitual criminals." (Pen. Code, § 11101.)

"The Attorney General shall file all plates, photographs, outline pictures, measurements, information and descriptions received and shall make a complete and systematic record and index, providing a method of convenience, consultation and comparison." (Pen. Code, § 11104.)

"(a) The Attorney General shall furnish, upon application in accordance with the provisions of subdivision (b) of this section, copies of all information pertaining to the identification of any person, such as a plate, photograph, outline picture, description, measurement, or any data about such person of which there is a record in the office of the bureau.

"(b) Such information shall be furnished to all peace officers, district attorneys, probation officers, and courts of the state, to United States officers or officers of other states, territories, or possessions of the United States, or peace officers of other countries duly authorized by the Attorney General to receive the same, and to any public defender or attorney representing such person in proceedings upon a petition for certificate of rehabilitation and pardon pursuant to Section 4852.08, upon application in writing accompanied by a certificate signed by the peace officer, public defender, or attorney, stating that the information applied for is necessary for the due administration of the laws, and not for the purpose of assisting a private citizen in carrying on his personal interest or in maliciously or uselessly harassing, degrading or humiliating any person.

"(c) Such information shall not be furnished to any persons other than those listed in subdivision (b) of this section or as provided by law; provided, that such information may be furnished to any state agency, officer, or official when needed for the performance of such agency's, officer's or official's functions." (Pen. Code, § 11105.)

In this appeal from a judgment of nonsuit pursuant to section 581c of the Code of Civil Procedure, special rules are applicable:

"At the outset we note that the judgment of nonsuit operated as an adjudication upon the merits. [Citations.] ■ Although the judgment of nonsuit is an adjudication upon the merits it is not treated on appeal like most appeals when it is the duty of the appellate court to indulge every reasonable intendment in favor of sustaining the trial court. The appro-

priate rule which the reviewing court must follow is that the court must view the evidence in the light most favorable to the appellant, must disregard all inconsistencies and draw only inferences from the evidence which can reasonably be drawn which are favorable to the appellant. [Citations.] ■ It is only when the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of the plaintiff that the granting of a motion for nonsuit is warranted. [Citations.]" (*Van Zyl* v. *Spiegelberg* (1969) 2 Cal.App.3d 367, 371-373 [82 Cal.Rptr. 689].)

As previously noted, the Bureau is required by law to receive and file information, fingerprints, photographs, crime reports, and other data submitted by law enforcement agencies, and to furnish, upon application, such information to authorized persons. (In general, see art. 3 (commencing with § 11100), ch. 1, pt. 4, tit. I, Pen. Code.)

In his complaint plaintiff makes a two-pronged attack. He first alleges that he was damaged by defendants' libelous utterances[1] and, secondly, that he was damaged through defendants' negligence and carelessness. With this background in mind, we turn to his contentions.

■ Plaintiff contends that the trial court erred when it held that the publication was absolutely privileged. In this connection, subdivision 1 of section 47 of the Civil Code provides:

"A privileged publication or broadcast is one made—

"1. In the proper discharge of an official duty." He contends the word "proper" is consistent with a qualified privilege (*Saroyan* v. *Burkett* (1962) 57 Cal.2d 706, 708-709 [21 Cal.Rptr. 557, 371 P.2d 293]), and that it means "free of negligence," and was therefore a question for the jury.

In *Saroyan,* the court examined the history behind subdivision 1 of section 47,[2] and ruled that the Superintendent of Banks was a state official

---

[1]"Libel is a false and unprivileged publication by writing, printing, picture, effigy, or other fixed representation to the eye, which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation." (Civ. Code, § 45.)

[2]"Section 47 was enacted in 1872, and subdivision 1 has remained the same since that time. The annotation to section 47 made by the Code Commission in 1872 is significant. In a preface to the annotated edition of the Civil Code, it was said that the purpose of the notes to the various sections was to explain the 'reason' and 'intent' of the law and that, wherever there was an intent to modify existing law, the reasons for the change would be given. With respect to section 47, the annotation consists solely of the citation of a textbook and three New York cases, and according to these authorities an absolute privilege was confined to statements made in the course of judicial or legislative proceedings. The cases that contain language to the effect that the privilege conferred by subdivision 1 is an absolute one, e.g., *Hale Co.*

corresponding in rank to federal cabinet officers, and thus press releases issued by him were absolutely privileged. Plaintiff contends that the individual defendants did not have a rank corresponding to federal cabinet officers.[3]

On the other hand, defendants submit that the *Saroyan* decision did not limit the applicability of the subdivision to state officers of the rank of federal cabinet members. They argue that public officials who are under a mandatory duty to publish information filed with them are entitled to an absolute privilege since they are publishing information in the "proper discharge of an official duty." (Cf. *Hale Company* v. *Lea* (1923) 191 Cal. 202, 205-207 [215 P. 900].)

No California case has been cited, and we have found none, which is precisely in point. There is a conflict in the decisions of other jurisdictions.

"The common law immunity of absolute privilege is also allowed to the principal executive officers in the nation and states. A similar rule is applied in England. The policy involved here is the same as that involved in other cases of absolute privilege. In order to insure efficient government, policy-forming officials must be free to exercise their best judgment in the performance of their duties. The chief problem is the determination of

v. *Lea,* 191 Cal. 202, 205 [215 P. 900]; *Snively* v. *Record Publishing Co.,* 185 Cal. 565, 577 [198 P. 1]; *Irwin* v. *Newby,* 102 Cal.App. 110, 115 [282 P. 810, 283 P. 370], did not consider the background of the subdivision or the meaning to be given to the word 'proper' therein, and the only case involving an executive official, *Hale Co.* v. *Lea, supra,* held that the official was not privileged because he was acting outside the scope of his authority.

"It thus appears that the problem of the extent, if any, to which executive officials have an absolute privilege cannot be satisfactorily resolved on the basis of the statutory language, the historical background of the subdivision or the California cases cited above, and a solution must be found by considering the treatment of the subject in the law generally. This approach is particularly appropriate in regard to the statute before us because it was evidently intended as a codification of the general principles developed by the courts.

". . . . . . . . . . . . . . . . .

"The rule as it has developed with respect to both federal and state officials of high rank is set forth in section 591 of the Restatement of Torts, which reads: 'The President of the United States and the Governor of any State or Territory thereof, cabinet officers of the United States and the corresponding officers of any State or Territory thereof are absolutely privileged to publish false and defamatory matter of another in the exercise of an executive function, if the matter has some relation to the executive proceeding in which the officer is acting.'

"We are in accord with the rule granting an absolute privilege to state officials corresponding in rank to federal cabinet members." (*Saroyan* v. *Burkett, supra,* 57 Cal.2d at pp. 709-710.)

[3] Although the Attorney General is required to exercise absolute control and management of the Bureau (Pen. Code, § 11005), he was not named as a party.

the officials who should receive the complete immunity. It is clear that the President of the United States and the governors of the various states and territories come within the rule, as do the members of the President's cabinet and heads of agencies and comparable state officers. As to officials below this rank, the cases are in conflict, some courts applying the rule of absolute privilege, others the more limited protection of qualified privilege in which protection is dependent on the honesty and reasonableness of the official's conduct." (1 Harper and James, The Law of Torts, § 5.23, p. 429; see also Note, 26 A.L.R.3d 492.)

The defendants' position is an appealing one, especially in view of the statutory scheme which requires the Bureau to collect and disseminate information relating to crime. However, there is no indication in *Saroyan* that absolute privilege is to be extended to executives of lesser rank. We therefore hold that the trial court erred in granting nonsuit on the basis that defendants' publications were absolutely privileged.

■ Plaintiff also contends that the trial court erred when it found this publication to be conditionally privileged. This contention has no merit.

Civil Code section 47, defining privileged communications, also includes the following:

"3. In a communication, *without malice,* to a person interested therein, (1) by one who is also interested, or (2) by one who stands in such relation to the person interested as to afford a reasonable ground for supposing the motive for the communication innocent, or (3) who is requested by the person interested to give the information." (Italics added.)

This subdivision sets forth a qualified privilege. (*Kapellas* v. *Kofman* (1969) 1 Cal.3d 20, 28 [81 Cal.Rptr. 360, 459 P.2d 912].) The dissemination of information furnished by the Bureau at an authorized recipient's request falls within this statute. This privilege, however, is termed "qualified" or "conditional" because it applies only to a communication made "without malice." (*Roemer* v. *Retail Credit Co.* (1970) 3 Cal.App.3d 368, 370-371 [83 Cal.Rptr. 540].) The term "malice" is discussed in *Mc-Cunn* v. *California Teachers Assn.* (1970) 3 Cal.App.3d 956, 962 [83 Cal. Rptr. 846]:

"The California Civil Code defines 'actual malice' as 'that state of mind arising from hatred or ill will toward the plaintiff; . . .' (Civ. Code, § 48a, subd. (4) par. (d).)

"Various definitions have also been announced by the California courts,

among them: '[Malice is] a desire or disposition to injure another founded upon spite or ill will. [While the] absence of malice is the absence of enmity.' (*Siemon* v. *Finkle,* 190 Cal. 611, 618 [213 P. 954].) '[The privilege] is lost if the publication is motivated by hatred or ill will . . . [citations], or by any cause other than the desire to protect the interest for the protection of which the privilege is given. . . . [It] is lost if [the publisher] has no reasonable grounds for believing his statements to be true.' (*Brewer* v. *Second Baptist Church,* 32 Cal.2d 791, 797 [197 P.2d 713].) Actual malice or malice in fact, is a state of mind arising from hatred or ill will, evidencing a willingness to vex, annoy, or injure another person. (*Davis* v. *Hearst,* 160 Cal. 143, 157 [116 P. 530].) ' "Actual malice, . . . means personal hatred or ill will towards the plaintiff, or wanton disregard of the civil obligations of the defendants toward the plaintiff." ' (*Hearne* v. *DeYoung,* 132 Cal. 357, 361-362 [64 P. 576].) Malice may also be implied if the defamatory remarks, although honestly believed to be true, are 'exaggerated, overdrawn, or colored to the detriment of plaintiff, or are not stated fully and fairly with respect to the plaintiff, . . .' (*Snively* v. *Record Publishing Co.,* 185 Cal. 565, 578 [198 P. 1].)"

In *Roemer* v. *Retail Credit Co., supra,* 3 Cal.App.3d at page 371, the court states: " '[O]rdinarily the privilege is lost if defendant has no reasonable grounds for believing his statements to be true' (*Brewer* v. *Second Baptist Church,* 32 Cal.2d 791, 797 [197 P.2d 713]). But this is not to say that mere negligence in making 'a sufficient inquiry into the facts on which the statement was based' does, of itself, relinquish the privilege. 'Mere inadvertence or forgetfulness, or careless blundering, is no evidence of malice.' (*Davis* v. *Hearst,* 160 Cal. 143, 167 [116 P. 530].)"

We note the holding in *Smith* v. *Hatch* (1969) 271 Cal.App.2d 39, 47-48 [76 Cal.Rptr. 350]: "Since the qualified privilege creates a presumption that the communication is made innocently and without malice (*Jones* v. *Express Publishing Co.,* 87 Cal.App. 246, 256 [262 P. 78]; *Lesperance* v. *North American Aviation, Inc.,* 217 Cal.App.2d 336, 341 [31 Cal.Rptr. 873]), the pleadings must contain affirmative allegations of malice in fact, and malice must exist as a fact in order to destroy the privilege. (*Lesperance* v. *North American Aviation, Inc., supra; Locke* v. *Mitchell,* 7 Cal.2d 599, 602 [61 P.2d 922]; *Larrick* v. *Gilloon,* 176 Cal.App.2d 408, 416 [1 Cal. Rptr. 360]; *McMann* v. *Wadler, supra.*) Such facts must establish that the person speaking the defamatory words entertained toward the person defamed a feeling of hatred or ill will going beyond that which the occasion for the communication apparently justified and different from that motive which prima facie rendered the communication privileged. [Citations.]"

With these principles in mind, we find nothing in the complaint or the

opening statement to support plaintiff's argument. There is no showing of malice on the part of the Bureau or its employees. It is true that the Bureau was advised by unsubstantiated statements that the information in plaintiff's record was false. However, the Bureau was under no duty to change or alter its records on the basis of the unsubstantiated word of the concerned individual. This is not a case where defendants had no reasonable grounds for believing their statements to be true. The information came from a law enforcement agency, and the Bureau was under a statutory duty to record and disseminate such information to authorized persons. Thus, we hold that the Bureau's dissemination of information was conditionally privileged. (See *Smith* v. *Hatch, supra,* 271 Cal.App.2d at p. 48.) In this connection it must be remembered that plaintiff made no effort to have the contributing agency rectify the alleged error.

Plaintiff alleges a "conspiracy of silence." A charge of "conspiracy" is easily conjured up. Plaintiff fails, however, to show how he could prove such a conspiracy. In fact, plaintiff was allowed access to his records, but for some reason failed to try and correct the mistake, if any.

Plaintiff further contends that the trial court erred in holding that no tort was demonstrated. The trial judge found, inter alia, that the claims of defamation, intentional infliction of emotional distress, and invasion of privacy were fatally defective since the necessary culpability was lacking. We agree.

The trial court found, and we so hold, that the publication of such material was conditionally privileged. There is no showing whatsoever of malice on the part of the Bureau's employees, and thus no abuse of the privilege. We hold that the trial court properly granted a nonsuit.

The judgment is affirmed.

Janes, J., concurred.

**FRIEDMAN, Acting P. J.**—I dissent in part, concur in part. The issue is whether government officials in charge of files reflecting the personal histories of private persons are immune from damage liability created by their dissemination of false, defamatory information in their files after its falsity has been brought to their attention by an affected person. In my opinion, they are not immune.

This is a damage action, not one for injunctive relief. The defendants are the State of California and A. L. Coffey, Chief of the Bureau of Criminal Identification and Investigation. The Bureau is a component of the Department of Justice, which is under the directorship of the State Attorney Gen-

eral. I concur in that portion of the decision affirming the nonsuit won by Mr. Coffey, but believe that the nonsuit won by the State of California should be reversed.

Our nation's current social developments harbor insidious evolutionary forces which propel us toward a collective, Orwellian society. One of the features of that society is the utter destruction of privacy, the individual's complete exposure to the all-seeing, all-powerful police state. Government agencies, civilian and military, federal, state and local, have acquired miles and acres of files, enclosing revelations of the personal affairs and conditions of millions of private individuals. Credit agencies and other business enterprises assemble similar collections. Information peddlers burrow into the crannies of these collections. Microfilm and electronic tape facilitate the storage of private facts on an enormous scale. Computers permit automated retrieval, assemblage and dissemination. These vast repositories of personal information may easily be assembled into millions of dossiers characteristic of a police state.[1] Our age is one of shriveled privacy. Leaky statutes imperfectly guard a small portion of these monumental revelations. Appellate courts should think twice, should locate a balance between public need and private rights, before deciding that custodians of sensitive personal files may with impunity refuse to investigate claims of mistaken identity or other error which threaten the subject with undeserved loss. The office of judges is to strike that balance rather than pursue sentiments of indignation or sympathy. It is obvious, nevertheless, that an unwarranted record of conviction, even of arrest, may ruin an individual's reputation, his livelihood, even his life.[2]

---

[1] See Packard, The Naked Society (1964); Brenton, The Privacy Invaders (1964); Westin, Privacy and Freedom (1967); Karst, *"The Files": Legal Control over the Accuracy and Accessibility of Stored Personal Data,* 31 L. & Contemp. Prob. 342; Note, *Credit Investigations and the Right to Privacy: Quest for a Remedy,* 57 Geo. L.J. 509; Comment, *Preventive Intelligence Systems and the Courts,* 58 Cal.L.Rev. 914.

[2] See *T.N.G.* v. *Superior Court,* 4 Cal.3d 767 [94 Cal.Rptr. 813, 484 P.2d 981]; *Sterling* v. *City of Oakland* (1962) 208 Cal.App.2d 1 [24 Cal.Rptr. 696]; Comment, *Guilt by Record,* 1 Cal. Western L.Rev. 126.

Dicta in a recent decision of the California Supreme Court describe both the public interest in circulating criminal information and the private interest which, at some point, gains dominance over the former:

"It is also generally in the social interest to identify adults currently charged with the commission of a crime. While such an identification may not presume guilt, it may legitimately put others on notice that the named individual is suspected of having committed a crime. Naming the suspect may also persuade eye witnesses and character witnesses to testify. For these reasons, while the suspect or offender obviously does not consent to public exposure, his right to privacy must give way to the overriding social interest." (*Briscoe* v. *Reader's Digest Association, Inc.,* 4 Cal.3d 529, 536 [93 Cal.Rptr. 866, 483 P.2d 34].)

". . . We must also be realistic enough to realize that full disclosure of one's

The criminal histories stored by the Bureau of Criminal Identification and Investigation are collected under statutory authority, primarily (but not entirely) for the socially important objective of crime control. No reasonable citizen would quarrel with the collection's primary objective. A statute restricts dissemination of these histories primarily (but not entirely) to those needing them for law enforcement. (Pen. Code, § 11105.) No statute fixes the duties of its custodians when they become aware of error or falsity threatening an innocent citizen with infamy.

The criminal histories in the Bureau, one surmises, are collections of "raw" fact, received from many sources and recorded without evaluation. No doubt inaccuracy, error and even outright falsity infiltrate the files. There will be little disagreement with the proposition that Bureau personnel are not obligated to investigate error or falsity until error or falsity is claimed. Penal Code section 11005 declares that the Attorney General shall exercise "absolute control and management" over the Bureau. This statute does not permit one to view the Bureau as an automaton, passively preserving all data transmitted to it and helplessly disseminating all information requested of it. Section 11005 supplies the Attorney General and his subordinates within the Bureau ample power to conduct a reasonable investigation into a criminal history which unjustly maligns an innocent citizen and to correct inaccuracies in the Bureau's records.

At this point the majority opinion states that "the Bureau was under no duty to change or alter its records on the basis of the unsubstantiated word of the concerned individual." In my view the quoted statement is an incorrect assumption of law.

Plaintiff's central allegations are these: In 1939 he had been involved in a youthful scrape of the "joy-riding" variety. As a result, a record was established in the Sacramento files of the Bureau showing that a juvenile court had placed him on probation for "grand theft, auto."[3] In 1941, a local

---

inner thoughts, intimate personal characteristics, and past life is neither the rule nor the norm in these United States. . . . [J]ust as the risk of exposure is a concomitant of urban life, so too is the expectation of anonymity regained. It would be a crass legal fiction to assert that a matter once public never becomes private again. Human forgetfulness over time puts today's 'hot' news in tomorrow's dusty archives. In a nation of 200 million people there is ample opportunity for all but the most infamous to begin a new life." (*Id.* at pp. 539-540.)

[3]According to current provisions of the Juvenile Court Law, juvenile wardship proceedings do not involve an "arrest" or "conviction." (Welf. & Inst. Code, § 503; *T.N.G.* v. *Superior Court, supra,* 4 Cal.3d 767.) The law also provides for court orders sealing juvenile court records and for destruction of case records in the hands of other agencies. (Welf. & Inst. Code, § 781.) The stigmatic consequences suffered by plaintiff were prophetically described by an official study conducted in 1960: "Much is made of the confidentiality of juvenile court records to avoid stigmatizing

police department caused a check forgery charge to be entered on his record at the Bureau. Included were notations of five separate aliases used by the forger and of his whereabouts at El Reno (the location and designation of an Oklahoma state prison). The entry was the result of mistaken identity, for plaintiff was not the forger. During the following years the erroneous forgery entry on his record at the Bureau caused rejection of applications for employment as a policeman and the actual loss of one police job. Eventually he discovered the cause of these rejections and in 1967 went to the Bureau, charging that his record was erroneous and requesting correction.[4] He was advised to take the matter up with the local police department which had furnished the information 26 years earlier. His effort to enlist the help of state officials proved fruitless and he brought this suit.

Propriety of the nonsuit turns on the adequacy of plaintiff's attorney's opening statement to the jury. The public tort liability law provides the state approximately the same liabilities and immunities as its employees. (Gov. Code, § 815.2.) Thus the state will be liable if its participating employees are liable.

Let us get our conceptual bearings. This action simultaneously bears the earmarks of a suit for libel and one for invasion of privacy.[5] Each of these theories of action postulates results which vary with the character of the defendant's communication, that is, whether it was innocent, malicious in fact, reckless or negligent.

---

the juvenile offender, but it is more often the CII and FBI arrest record that haunts him in later years." (Report of the Governor's Special Study Commission on Juvenile Justice, Part I (1960) p. 47, quoted in *T.N.G.* v. *Superior Court, supra,* 4 Cal.3d at p. 780, fn. 18.) The *T.N.G.* opinion contains an extensive bibliography dealing with the stigmatic effects of relatively light brushes with the law and the relative ineffectuality of suppression or "expungement" procedures. A simple but effective approach exists in New York. Ever since 1907 a law of that state has required the return of police records upon demand of persons arrested but not convicted of crime. (N.Y. Pen. Law, § 516.)

[4]In a supplementary statement to the jury, plaintiff's attorney described correspondence between the Bureau and local police agencies from which Bureau personnel might conceivably have inferred as early as 1951 that its record was erroneous. These statements fell far short of fastening the Bureau with knowledge of the error prior to plaintiff's visit to the Bureau in 1967. Under no reasonable view of the evidence described in the opening statement could the Bureau have been charged with knowledge prior to the 1967 visit.

[5]Conceivably, also, the claim might be classed as one for negligence, i.e., breach of a duty of care arising from the custodian's recognition that the dissemination of information falsely attributing crime is likely to result in injury. (See Civ. Code, § 1714; *Rowland* v. *Christian* (1968) 69 Cal.2d 108, 112 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496].) One commentator suggests that the vocabulary of negligence law is too loose for balancing the competing interests involved in suits for verbal injuries. (Green, *The Duty to Give Accurate Information,* 12 U.C.L.A. L.Rev. 464, 472-473.)

For the purpose of a libel action, communications of the Bureau of Criminal Identification and Investigation are conditionally privileged, even if erroneous or inaccurate; malice alone would cause loss of the privilege.[6] While mere negligence does not amount to malice, the latter appears when the statement was made with willful disregard for accuracy.[7] Were libel plaintiff's sole theory of recovery, it would be necessary that he satisfy the jury that the Bureau acted with willful disregard of the harm emanating from an untrue report of crime. (See *A.B.C. Needlecraft Co.* v. *Dun & Bradstreet, Inc., supra.*) Its unrealistic advice that plaintiff solicit the benevolence of the local police department which, a quarter-century earlier, had originated the error, was a bland cloak for official indifference, shunting the citizen in Kafkaesque fashion from agency to agency. Willful disregard lay not so much in the Bureau's communications of the record as in its willful immobility when the victim sought correction.[8]

Alternatively, the lawsuit is one for invasion of privacy. California law recognizes the actionable character of disclosures which unjustifiably expose the plaintiff's personal affairs to public view. When the disclosure is false or puts the plaintiff in a false light, his lawsuit may move from the traditional defamation category and seek its legal underpinnings in the privacy cases.[9] Although lack of malice is not a defense in a privacy invasion suit, somewhat parallel defenses are available, for example, the public interest in the disclosure or defendant's furtherance of its own legitimate functions. (See *Time, Inc.* v. *Hill* (1967) 385 U.S. 374, 383-390 [17 L.Ed. 2d 456, 464-468, 87 S.Ct. 534]; *Briscoe* v. *Reader's Digest Association, supra; Werner* v. *Times-Mirror Co., supra*; 1 Witkin, Summary of Cal. Law

---

[6]Civil Code, section 47. See cases collected in Maxey, *Police Tort Liability for Defamation,* 16 Clev.-Mar. L.Rev. 435.

[7]*Roemer* v. *Retail Credit Co.* (1970) 3 Cal.App.3d 368, 371-372 [83 Cal.Rptr. 540]. See *Stationers Corp.* v. *Dun & Bradstreet, Inc.* (1965) 62 Cal.2d 412, 418 [42 Cal.Rptr. 449, 398 P.2d 785]; cf. *Pavlovsky* v. *Board of Trade* (1959) 171 Cal.App.2d 110, 114 [340 P.2d 63]; *A.B.C. Needlecraft Co.* v. *Dun & Bradstreet, Inc.* (2d Cir. 1957) 245 F.2d 775, 777; *Dun & Bradstreet, Inc.* v. *Robinson* (1961) 233 Ark. 168 [345 S.W.2d 34, 39]; Note, *Credit Investigations and the Right to Privacy: Quest for a Remedy,* 57 Geo.L.J. 509, 515-516.

[8]One commentator has pointed out: "The subject himself is the best assistant the police agency can have in clearing up cases of mistaken identity or other omissions such as acquittals or other dispositions favorable to him." (Karst, *op. cit. supra,* 31 L. & Contemp. Prob. at pp. 367-368.

[9]Prosser, Torts (3d ed.) pp. 837-839; Wade, *Defamation and the Right of Privacy,* 15 Vand.L.Rev. 1093, 1121; Prosser, *Privacy,* 48 Cal.L.Rev. 383, 398-401; Bloustein, *Privacy as An Aspect of Human Dignity: An Answer to Dean Prosser,* 39 N.Y.U.L.Rev. 962; Kalven, *Privacy in Tort Law—Were Warren and Brandeis Wrong?* 31 L. & Contemp. Prob. 326, 339-341; see *Werner* v. *Times-Mirror Co.* (1961) 193 Cal.App.2d 111, 120 [14 Cal.Rptr. 208].

(1960) Torts, § 136; Prosser on Torts (3d ed.) p. 851.) In a general way, all these defenses involve judicial balance between the plaintiff's right to be "let alone" and the public interest in the disclosure. The point here is that the disclosure's truth, falsity or reckless disregard of truth profoundly alters the array of interests on each side of the lawsuit. (See, e.g., *Time, Inc.* v. *Hill, supra.*)

Crucial at this point is plaintiff's allegation that the Bureau of Criminal Identification and Investigation continued to circulate his history after he claimed its falsity and requested correction. Statutory policy and overriding public interest had originally called upon the Bureau to disseminate defendant's record to authorized agencies. (*Briscoe* v. *Reader's Digest Association,* quote *ante,* fn. 2.) That interest suffered a profound alteration when plaintiff in 1967 brought the error of identity to the Bureau's attention. A minimal inquiry might have sufficed to reveal the error. The public interest in the circulation of criminal histories among enforcement agencies emphatically did not call for a *false* history. In counterbalance, plaintiff's private interest—his interest to be free of damaging, unwarranted intrusions—emphatically cried out for suppression of the false report.

In his opening statement to the jury, plaintiff's attorney described how his client had lost or been denied employment prior to 1967. The attorney went farther. He told the jury: "If that record is being published now, and we understand it has been published since 1967 at least eight or ten times, and it still has an alias on there, then those publications have been made in spite of the fact that CI&I knew there was no alias supposed to be on that record."

The attorney's declarations are ambiguous. They do not state specifically that the Bureau continued to give out the damaging information after 1967. In reviewing the nonsuit, we must accept these declarations in the light most favorable to plaintiff and draw all reasonably available favorable inferences. (*Van Zyl* v. *Spiegelberg* (1969) 2 Cal.App.3d 367, 372 [82 Cal. Rptr. 689].) Viewing the attorney's opening statement in the light most favorable to plaintiff, we must infer an allegation that the Bureau continued to give out the damaging information after its falsity had been brought to its attention. That allegation, in my view, sufficed to state a cognizable claim against the State of California, proof of which would justify an award of resultant damage.

Since plaintiff's suit against the State requires him to establish the liability of its employees, Government Code section 820.2 requires consideration. That section immunizes public employees from liability for injuries resulting from the exercise of discretion. In the sense intended by section

820.2, discretionary activity is that involved in basic policy decisions, sometimes characterized as the "planning" as opposed to the "operational" level of decision-making. (*Johnson* v. *State of California* (1968) 69 Cal.2d 782, 793-794 [73 Cal.Rptr. 240, 447 P.2d 352]; *Ramos* v. *County of Madera*, 4 Cal.3d 685 [94 Cal.Rptr. 421, 484 P.2d 93].) The rejection of plaintiff's demand for correction of his record and its continued dissemination thereafter do not rise to the level of discretionary activity.

The opening statement described no ground of recovery against A. L. Coffey individually. A public official has no personal vicarious liability for a wrong committed by his subordinates unless he negligently selected or retained unfit subordinates. (*Fernelius* v. *Pierce* (1943) 22 Cal.2d 226, 235 [138 P.2d 12].) The opening statement did not charge Mr. Coffey with that kind of negligence. Except that he signed a letter in 1962 (before the Bureau was notified of the error in its records), there is no allegation that Mr. Coffey personally participated in any of the events. Thus the nonsuit in favor of Mr. Coffey was entirely proper.

I would reverse the nonsuit judgment won by the State of California.

Appellant's petition for a hearing by the Supreme Court was denied September 2, 1971.