Filed 6/9/14  Sachs v. San Diego Center for Children CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

|  |  |
|---|---|
| JEANINE SACHS,<br><br>     Plaintiff and Appellant,<br><br>     v.<br><br>SAN DIEGO CENTER FOR CHILDREN et al.,<br><br>     Defendants and Respondents. | D063245<br><br><br>(Super. Ct. No. 37-2010-00093951-<br>CU-DF-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, Steven R. Denton, Judge.  Affirmed; motion and cross-motion for sanctions denied.

Kramer Law Office and Melody A. Kramer for Plaintiff and Appellant.

Seltzer Caplan McMahon Vitek and Tracy Anne Warren, Kathryn B. Gray for Defendants and Respondents.

Plaintiff and appellant Jeanine Sachs appeals from a summary judgment entered in favor of her former employer, San Diego Center for Children (Center), and Center

employees Rachel Powers, Tara Davis, Danielle Domingue and Amanda Bates on Sachs's first amended complaint for defamation, inducing breach of contract, intentional interference with prospective economic advantage, and breach of the covenant of good faith and fair dealing. In part, the trial court ruled that e-mails Sachs had alleged were defamatory fell within the common-interest privilege of Civil Code[1] section 47, subdivision (c), and Sachs's evidence, including evidence that she had previously disciplined some of the individual defendants, did not demonstrate malice on their part so as to defeat that privilege. Sachs contends she presented "significant" evidence of malice and otherwise raised triable issues of material fact preventing summary judgment on her remaining causes of action. We disagree and affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

We set out the undisputed facts from the parties' separate statements and evidence supporting their moving and opposing papers, and view other facts in the light most favorable to Sachs as the party opposing summary judgment. (Code Civ. Proc., § 437c, subd. (c); *Neilsen v. Beck* (2007) 157 Cal.App.4th 1041, 1044, fn. 1; see *Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 335, fn. 7 (*Guz*).)

Center provides mental health, educational and social services to troubled and adolescent children in San Diego County. In August 2006, Sachs was hired as a program manager at Center's Discovery Hills Day Treatment Program (Discovery Hills), which provides a daily school environment in a support-based community setting for children

---

[1]     Statutory references are to the Civil Code unless otherwise specified.

ages 6 through 12. At that time, Sachs reviewed and signed Center's employee handbook as well as an employee statement indicating her employment was at will. Sachs's program manager duties included overseeing the program; counseling individuals, groups and families; attending meetings; supervising staff; overseeing the completion of charts; and fiscal oversight, including creating and overseeing a budget for Discovery Hills. Program managers were required to be on campus a minimum of eighty percent of the time.

From March 2008 to August 2010, Powers was the program manager for another Center program serving adolescents, Discovery Valley Adolescent Day Treatment Program (Discovery Valley), which occupies the same buildings and campus as Discovery Hills. Sachs supervised Powers, who did not have the required license. Misty Wilkerson-Howard was a quality assurance manager in Center's clinical support division. Domingue was the administrative assistant for the Discovery Hills and Discovery Valley programs from June 2007 to September 2010, and she was present almost daily with Sachs, her supervisor. Sachs also supervised Bates, who as of December 2006 was Discovery Hills' lead child development counselor, as well as Davis, who was a lead child development counselor for Discovery Valley from 2009 to January 2011.

The Discovery Hills and Discovery Valley programs receive funding from the state of California after the submission of a request for proposal (RFP) through which Center provides detailed information to San Diego County. All of the program managers worked with quality assurance personnel, staff and grant writers to compile information

3

for RFPs, and Sachs, Powers and Wilkerson-Howard were responsible for RFP content in 2010.

In May 2008, Sachs received a report that Powers had engaged in inappropriate and unprofessional behavior of a sexual nature in the workplace. Sachs counseled Powers about the matter in May 2008.

In July 2008, five staff members, including two friends of Powers and Domingue, wrote a letter expressing their concern about Sachs's performance as a manager and the direction of the Discovery Hills program under her management. Powers, Bates and Davis were not among the employees making the July 2008 complaint. Sachs knew about the complaints but viewed the situation differently. Wilkerson-Howard and Center's executive director, Marty Giffin, investigated the complaints and concluded some of the complaining individuals were not credible; Wilkerson-Howard additionally felt all of the issues with Sachs's management could be corrected. Nevertheless, Center wrote a "team building action plan" for Sachs, which Sachs signed.[2]

In August 2008, Sachs counseled Powers again about her inappropriate behavior, and Powers received and signed a notice of written disciplinary action concerning the

---

[2] Sachs purported to assert below and repeats on appeal that in July 2008 she had recommended to Giffin, who supervised both Sachs and Powers, that Powers be replaced with a licensed program manager due to Powers's lack of judgment and self-control, but her request was denied. However, the evidence cited in Sachs's separate statement, paragraph 8 of Sachs's declaration, does not support that proposition. At that portion of her declaration, Sachs states, "In November 2009, [Bates] was written up by me for insubordination due to failure to follow [my] directive. [Center's] Human Resources Manager, Anette Nelson, backed me up. However, [Bates] continued to complain behind my back."

4

incidents. Giffin, Sachs, and Center's human resources representative, Anette Nelson, also signed the report. By June 2009, Powers had completed a performance improvement plan related to those incidents.

In November 2009, Dave McCaslin, Center's chief executive officer, became Sachs's direct supervisor. About that time, Bates had expressed concern to Giffin, Nelson, Wilkerson-Howard and McCaslin about Sachs's hostile treatment of staff, and neglect of staff and clients creating a safety risk. Giffin related the complaint to McCaslin. Thereafter, Sachs started to write Bates up for insubordination, but Sachs did not follow Center's procedures for that process. Bates contacted Nelson herself about the incident. Bates had been documenting her concerns about Sachs's management and actions since late October 2009.

In mid-November 2009, Bates spoke with McCaslin and Nelson about Sachs's mismanagement, unprofessional conduct and absenteeism, and expressed concern about the safety of the Discovery Hills program. McCaslin believed Bates and eventually spoke with Powers about Bates's complaints. He instructed Nelson to draft a performance improvement plan for Sachs. McCaslin decided to wait until Center had submitted its RFP at the end of January 2010 to deliver the plan to Sachs.

In late December 2009, Center began its RFP process for which Sachs and Powers were required to collect and submit program information to Wilkerson-Howard. Though Sachs was responsible for the Discovery Hills portion of the RFP, she sought help from two employees and also from her domestic partner, who was not a Center employee. Wilkerson-Howard, who worked directly with Sachs, found Sachs's work on the RFP to

5

be unsatisfactory and Sachs's information unusable. In early January 2010, Wilkerson-Howard told McCaslin about her concerns over Sachs's lack of knowledge and poor work quality.

During January 2010, McCaslin received e-mails from Domingue, Wilkerson-Howard, Powers and Davis, who each expressed concerns about Sachs's treatment of children and Center staff, as well as her work performance. Specifically, on January 15, 2010, Domingue reported to McCaslin, Nelson and Wilkerson-Howard that Sachs had used a therapist and Bates to help her with her RFP instead of allowing them to do their jobs, and had used profanity in front of clients. Domingue additionally informed McCaslin about an incident occurring on January 14, 2010, in which Sachs had instructed Bates and another staff member to turn off their radios while they worked on the RFP, resulting in a safety issue. Dominque stated she did not want the incident to negatively impact the program and that she felt it was important to pass the information on to management.

On January 20, 2010, Wilkerson-Howard reported to Nelson and McCaslin that she had received a call from a Center staff member complaining about the way Sachs treated him or her, but who did not want to be involved in any formal complaint. In part, Wilkerson-Howard stated: "I'm really worried that due to the stress [Sachs] appears to be causing staff, it is certainly going to effect [*sic*] the quality of care we are providing to those students, and apparently already has (per the most recent complaint). [¶] . . . I'm afraid we could be dealing with a serious situation if we don't resolve some of the issues

6

up there soon. Just wanted to add my two cents and my concern for the program, both staff and students."

On January 29, 2010, Davis reported in an e-mail to McCaslin and Nelson that Sachs had engaged in an "unsupportive interaction" with a child new to Discovery Valley. Davis stated that she felt Sachs's comments were unfounded, unsolicited and intentionally put the client down. She pointed out the client was still nervous about his new surroundings, and he had been trying to be appropriate and follow the program. That same day, Powers e-mailed McCaslin, Nelson, and Pam Hanson, Center's director of children's residential program, stating she could not ignore what she felt were Sachs's violations of policies, procedures, ethical guidelines and good practice. Powers described instances in late 2009 or early 2010 of Sachs's absences, neglect or poor handling of job responsibilities and inappropriate treatment of clients and staff.[3] Powers's report had expressed concern over nearly the same issues regarding Sachs from 2008.

---

[3] As for Sachs's treatment of clients, Powers reported that on January 8, 2010, and January 29, 2010, she witnessed Sachs curse in front of clients; on January 22, 2010, she witnessed Sachs "allowing a parent to verbally abuse a client and not step in and stop the assault"; in November 2009 she witnessed Sachs "failing to intervene when a client's uncle literally pulled the client up and out of his seat by his long hair in front of other clients and staff to which I and John Laidlaw had to intervene and file the [child protective services] report"; and on December 11, 2009, January 20, 2010, and January 28, 2010, Sachs "yell[ed] at clients" and told them to "Stop it," when they were acting out. Powers also reported that Sachs "instigates clients who are already escalated and does not follow proper de-escalation procedures"; specifically that "a client was cursing at [Sachs] and trying to attack her and she continued to engage in a power struggle with the client and yelled at him." Powers stated that Sachs did not attend certain treatment or individual education plan meetings, and due to her lack of participation, clients, parents and professionals did not know who she was or her role.

McCaslin decided to terminate Sachs, and did so on February 1, 2010. In terminating Sachs, he did not mention any of the January 2010 e-mails.

Sachs sued Center, Powers, Davis, Domingue and Bates, and eventually filed a first amended complaint alleging defamation against Powers, Davis, Domingue and Center (first through fourth causes of action), as well as inducing breach of contract (fifth cause of action) and intentional interference with prospective economic advantage (sixth cause of action) as to the individual defendants. Sachs also alleged Center breached the implied covenant of good faith and fair dealing (seventh cause of action). In part, Sachs alleged that the individual defendants made specified false statements "in the course and scope of [their] employment at [Center]" in communications to Sachs's supervisors and others. Sachs also alleged the individual defendants published the statements with malice in that they knew the statements were false and made with intent that Sachs lose her employment with Center, and Center "ratified" the e-mails by using them as grounds for terminating her employment.

Center and the individual defendants moved for summary judgment or alternatively summary adjudication of issues. They maintained McCaslin decided to terminate Sachs before the individual defendants sent their e-mails, that the information in the e-mails was truthful, and that the e-mails were privileged under section 47, subdivision (c) as sent to those having a common interest. Defendants filed sworn declarations from each individual defendant, as well as from McCaslin, Wilkerson-Howard, and senior program manager Lori Barnes. The individual defendants stated that they made their comments to Center management concerning Sachs's performance in

8

good faith for the purpose of advancing the children's interests, without any malice, hatred or ill will toward Sachs.

McCaslin averred that by November 2009 Sachs reported directly to him, and in 2008 he knew that the majority of Sachs's staff had written a letter concerning Sachs's neglect of her duties, employees and jobs. He also knew that many of her staff had resigned due to the discordant work environment she created as well as her ineffective management style, among other concerns. He stated he had come to the conclusion that Sachs was not right for the program manager position based on information he had received in late December 2009 and early January 2010.

McCaslin averred that on January 14, 2010, he made the decision to terminate Sachs once Center had submitted its request for proposal to the county on January 29, 2010. According to McCaslin, he told Wilkerson-Howard of his decision that day. McCaslin stated that afterwards he received the e-mail from Dominque concerning the January 14, 2010 incident and the other e-mails from Davis and Powers expressing their concern about Sachs's neglect of children, Center employees and her program manager duties. McCaslin averred that by that time he had already told human resources to start preparing Sachs's termination paperwork.

Sachs opposed the defendants' motion. She identified the triable issues of material fact as (1) "why [Sachs] was terminated from her employment at [Center]," and (2) "the reasons why Defendants choose [*sic*] to make false and defamatory statements about . . . Sachs to her superiors." Sachs argued that McCaslin's reasons for her termination had changed, and that he and others tried to "hide their intent to remove [Sachs] as Program

9

Manager of the Discovery Hills program to enhance their funding request to the County of San Diego."  Pointing out Domingue, Davis and Powers were "mandated reporters of suspected child neglect," Sachs argued their e-mails accused Sachs of a crime—neglecting children—without using care to determine the truth of that accusation, and she claimed Domingue, Davis and Powers later recanted their accusations.  Sachs argued Center defamed her by designating her termination as being based on poor performance and child neglect, which it assertedly later disavowed.  As for the section 47, subdivision (c) qualified privilege, Sachs argued Center's sole evidence in support of its motion was of the individuals' own state of mind denying malice, which the court could reject as evidence of a material fact under Code of Civil Procedure section 437c, subdivision (e).

With respect to her contract-related claims against Center and the individuals, Sachs argued Center had admitted the existence of a contract with Sachs; the individuals knew about that contract because they had similar arrangements; the individuals' declarations as to their state of mind were insufficient to disprove their intent to disrupt the performance of Sachs's contract; the individuals did not act to resolve problems with Sachs but with intent to have Sachs terminated; McCaslin testified he received the e-mails and terminated Sachs as a result of her neglect of children; and Center breached the covenant of good faith and fair dealing by accepting the e-mails at face value without investigating the truth or falsity of their contents.

In reply, defendants pointed out that several of Sachs's opposing summary judgment papers were served and filed late, as well as procedurally deficient, requiring that the court disregard them or grant summary judgment.  Defendants also responded to

10

Sachs's evidence and her separate statement of material undisputed facts with numerous evidentiary objections. In part, they asserted the court could not take judicial notice of the truth of the contents of declarations submitted in support of defendants' prior Code of Civil Procedure section 425.16 motion to strike.

Overruling all of defendants' evidentiary objections, the trial court tentatively granted summary judgment. In a lengthy order, it ruled that as to the first through fourth defamation causes of action, defendants' conduct was privileged under section 47, subdivision (c), and Sachs's evidence was either insufficient to prove the sort of malice necessary to overcome that privilege, or constituted inadmissible double hearsay. As to the fifth and seventh causes of action for interference with contract and breach of the implied covenant of good faith and fair dealing, it ruled Center provided undisputed evidence that Sachs's employment was at will, and Sachs provided no evidence of an employment contract. With regard to the sixth cause of action for intentional interference with economic relations, it ruled the absence of evidence of malice was fatal to the claims against Powers, Davis and Domingue, and that Bates's 2009 write-up likewise did not constitute evidence of malice.

On October 29, 2012, the court entered judgment in defendants' favor. At some point, Sachs moved for reconsideration of the court's summary judgment ruling. She argued reconsideration was justified by new documents including a "serious incident report" assertedly produced by defendants after she had filed her summary judgment opposition, newly acquired testimony from witnesses Frances Edwards and Jennifer Maley, and newly acquired evidence consisting of a "team building plan" and

11

Domingue's e-mail comments about that plan. The court heard and denied the motion on November 9, 2012, on grounds the court was divested of jurisdiction to reconsider its ruling on defendants' motion following entry of the judgment.

Sachs appeals from the October 29, 2012 judgment.[4]

## DISCUSSION

### I. *Defendants' Request to Strike Sachs's Opening Brief*

Defendants ask us to strike or treat as waived portions of Sachs's opening brief for noncompliance with California Rules of Court and her failure to support arguments and factual assertions with citations to authority or the record. They also maintain Sachs has not complied with the requirement of a summary judgment separate statement. We deny defendants' request to strike significant portions of Sachs's opening brief, notwithstanding the fact the brief contains factual assertions without citation to the record in violation of California Rules of Court, rule 8.204(a)(1)(C). When an appellate brief contains references to matters not supported by the record on appeal, we can simply ignore these references rather than strike them. (Cal. Rules of Court, rule 8.204(e)(2)(C); *Connecticut*

---

[4] Sachs does not separately identify in her notice of appeal the court's postjudgment November 9, 2012 order denying reconsideration. This precludes her from raising arguments concerning her reconsideration motion, including by pointing to the assertedly new evidence submitted with that motion to challenge the court's entry of summary judgment. (*Sangster v. Paetkau* (1998) 68 Cal.App.4th 151, 163 [appellate court may consider only those facts before the trial court].) " ' "[W]here several judgments and/or orders occurring close in time are separately appealable . . . , each appealable judgment and order must be expressly specified—in either a single notice of appeal or multiple notices of appeal—in order to be reviewable on appeal." ' [Citations.] The policy of liberally construing a notice of appeal in favor of its sufficiency [Citation] does not apply if the notice is so specific it cannot be read as reaching a judgment or order not mentioned at all." (*Filbin v. Fitzgerald* (2012) 211 Cal.App.4th 154, 173.)

12

*Indemnity Co. v. Superior Court* (2000) 23 Cal.4th 807, 813, fn. 2.)  We will disregard assertions unsupported by admissible evidence or legal authority and address the propriety of the summary judgment in defendants' favor.

## II.  *Summary Judgment was Properly Granted*

### A.  *Standard of Review*

Summary judgment is appropriate "if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  (Code Civ. Proc., § 437c, subd. (c).)  A defendant who moves for summary judgment or summary adjudication bears the initial burden to show that the cause of action has no merit—that is, "that one or more elements of the cause of action, even if not separately pleaded, cannot be established, or that there is a complete defense to that cause of action."  (Code Civ. Proc., § 437c, subds. (a) & (p)(2).)

If the defendant carries that burden, "the opposing party is then subjected to a burden of production of his own to make a prima facie showing of the existence of a triable issue of material fact."  (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 (*Aguilar*).)  A triable issue of material fact exists " 'if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof.'  [Citation.] Thus, a party 'cannot avoid summary [adjudication] by asserting facts based on mere speculation and conjecture, but instead must produce admissible evidence raising a triable issue of fact.' "  (*Dollinger DeAnza Associates v. Chicago Title Ins. Co.* (2011) 199 Cal.App.4th 1132, 1144-1145.)

On review of a summary judgment, we take the facts from the record before the trial court when it ruled on the motion (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1037), disregarding evidence to which objections were made and sustained. (Code Civ. Proc., § 437c, subd. (c); *Guz, supra*, 24 Cal.4th at p. 334.) "We review the record and the determination of the trial court de novo." (*Kahn v. East Side Union High School Dist.* (2003) 31 Cal.4th 990, 1003.) "In performing our de novo review, we must view the evidence in a light favorable to plaintiff as the losing party [citation], liberally construing [the plaintiff's] evidentiary submission while strictly scrutinizing defendants' own showing, and resolving any evidentiary doubts or ambiguities in plaintiff's favor." (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768.)

B. *Sachs's First through Fourth Causes of Action for Defamation are Barred by the Qualified Privilege for Communications Between Interested Persons*

"The tort of defamation 'involves (a) a publication that is (b) false, (c) defamatory, and (d) unprivileged, and that (e) has a natural tendency to injure or that causes special damage.' " (*Taus v. Loftus* (2007) 40 Cal.4th 683, 720; see *Hui v. Sturbaum* (2014) 222 Cal.App.4th 1109, 1118.) In this case, we need not address the first, second, third and fifth elements of the tort, as defendants have met their threshold summary judgment burden to establish the communications alleged to be defamatory fall within the qualified common-interest privilege of section 47, subdivision (c), and Sachs has not met her responsive burden to present facts from which a reasonable trier of fact may conclude or infer defendants acted with malice, so as to preclude the privilege's application.

14

1. *The Common-Interest Privilege of Section 47, Subdivision (c)*

Section 47, subdivision (c) provides that a privileged publication or broadcast is one made "[i]n a communication, without malice, to a person interested therein, (1) by one who is also interested, or (2) by one who stands in such a relation to the person interested as to afford a reasonable ground for supposing the motive for the communication to be innocent, or (3) who is requested by the person interested to give the information."  This provision "extends a conditional privilege against defamation to statements made without malice on subjects of mutual interest[ ]. [Citations.]  This privilege is 'recognized where the communicator and the recipient have a common interest and the communication is of a kind reasonably calculated to protect or further that interest.' [Citation.]  The 'interest' must be something other than mere general or idle curiosity, such as where the parties to the communication share a contractual, business or similar relationship or the defendant is protecting his own pecuniary interest.  [Citation.] Rather, it is restricted to 'proprietary or narrow private interests.' "  (*Hawran v. Hixson* (2012) 209 Cal.App.4th 256, 287.)

Thus, the common interest privilege "has been determined to apply to statements by management and coworkers to other coworkers explaining why an employer disciplined an employee." (*McGrory v. Applied Signal Technology, Inc.* (2013) 212 Cal.App.4th 1510, 1538, citing *Deaile v. General Telephone Co. of California* (1974) 40 Cal.App.3d 841, 846 & *King v. United Parcel Service, Inc.* (2007) 152 Cal.App.4th 426, 440; see *Noel v. River Hills Wilsons, Inc.* (2003) 113 Cal.App.4th 1363, 1369 ["Courts have consistently interpreted section 47, subdivision (c) to apply in the employment

15

context."]; *Cruey v. Gannett Co.* (1998) 64 Cal.App.4th 356, 369 [manager's complaint to department of human resources about workplace harassment is conditionally privileged]; *Cuenca v. Safeway San Francisco Employees Fed. Credit Union* (1986) 180 Cal.App.3d 985, 995.) " 'Clearly, an employer is privileged in pursuing its own economic interests and that of its employees to ascertain whether an employee has breached his responsibilities of employment and if so, to communicate, in good faith, that fact to others within its employ so that (1) appropriate action may be taken against the employee; (2) the danger of such breaches occurring in the future may be minimized; and (3) present employees may not develop misconceptions that affect their employment with respect to certain conduct that was undertaken in the past.' " (*McGrory v. Applied Signal Technology, Inc*., at p. 1538.)

The privilege will not arise, however, where the plaintiff establishes the communication at issue was made with actual malice, i.e., " ' "a state of mind arising from hatred or ill will, evidencing a willingness to vex, annoy or injure another person." ' " (*Kashian v. Harriman* (2002) 98 Cal.App.4th 892, 914; see also *Taus v. Loftus*, *supra*, 40 Cal.4th at p. 721; *Brown v. Kelly Broadcasting Co.* (1989) 48 Cal.3d 711, 723, fn. 7 ["[I]f malice is shown, the [section 47, subdivision (c)] privilege is not merely overcome; it never arises in the first instance."].) The sort of malice required to defeat a qualified privilege may also be established " ' "by a showing that the defendant lacked reasonable ground for belief in the truth of the publication and therefore acted in reckless disregard of the plaintiff's rights." ' " (*Taus v. Loftus*, at p. 721.)

16

Whether the privilege arises is ordinarily a question of law.  (*Mann v. Quality Old Time Service, Inc.* (2004) 120 Cal.App.4th 90, 108; *Hui v. Sturbaum*, *supra*, 222 Cal.App.4th at p. 1119.)  Defendants have the initial burden of showing the allegedly defamatory statements were made on a privileged occasion and thereafter the burden shifts to Sachs to establish defendants made the statements with malice.  (*Taus v. Loftus*, *supra*, 40 Cal.4th at p. 721.)

2. *Defendants Met Their Burden to Show Each of the Individual Defendants' Allegedly Defamatory Communications Are Conditionally Privileged*

Sachs does not challenge whether defendants met their threshold summary judgment burden to show the privileged nature of the individual defendants' January 2010 e-mail communications.  The evidence shows the January 2010 e-mails were made internally within Center solely for the purpose of reporting concerns with Sachs's work performance.  Sachs has not identified any external, non-Center-affiliated third parties to whom those statements were communicated and who might have understood them to have a defamatory meaning.  Indeed, in her deposition, Sachs admitted the e-mails were sent only to other Center employees, and that she had no knowledge they were sent to other persons.  Sachs has not shown any statements made about her arose on an occasion falling outside the scope of the common interest privilege.  Thus, there appears to be no dispute that the e-mail statements of Domingue, Powers and Davis "were of a kind reasonably calculated to protect or further a common interest of both the communicator and the recipient."  (*Deaile v. General Telephone Co. of California*, *supra*, 40 Cal.App.3d at p. 847; see *King v. United Parcel Service, Inc.*, *supra*, 152 Cal.App.4th at p. 440

17

["[p]arties in a business . . . relationship have the requisite 'common interest' for the privilege to apply"].)

The substance and context alone renders the statements subject to the common interest privilege in the absence of any evidence to suggest they were made maliciously. We conclude defendants met their burden to show those e-mail communications, which Sachs alleges were made "in the course and scope of [their] employment at [Center]" in communications to Sachs's supervisors and other managers, fall within the common-interest privilege.

3. *Summary Judgment is Proper if There is No Triable Issue of Material Fact as to Malice for Purposes of Defeating the Section 47, Subdivision (c) Privilege*

Citing *McMann v. Wadler* (1961) 189 Cal.App.2d 124 and *Cruey v. Gannett Co.*, *supra*, 64 Cal.App.4th 356, Sachs argues that the issue of malice for purposes of a qualified privilege "is a question of fact for a jury as a matter of law." According to Sachs, "a summary judgment issued on this question is grounds for reversal on appeal."

To the extent Sachs is arguing that summary judgment is never appropriate when the viability of a defamation cause of action turns on the presence or absence of malice to defeat the section 47, subdivision (c) privilege, she is incorrect. If a summary judgment opponent's facts are insufficient to prove or infer malice, a defendant may obtain summary judgment on the qualified privilege as long as it has demonstrated the communications were made on a privileged occasion. *McMann v. Wadler*, *supra*, 189 Cal.App.2d 124 does not stand for Sachs's proposition. Indeed, in *McMann*, involving a jury's implied finding of malice, the appellate court pointed out malice does not

18

automatically result in a jury question; holding the evidence supported the jury's finding, it observed "the evidence of prior defamation of similar import in this case was sufficient to justify submission of the question to the jury." (*McMann v. Wadler*, at pp. 126, 129.) Nor is Sachs's contention supported by *Cruey v. Gannett Co.* There, the appellate court held under the specific facts of that case the plaintiff had raised a triable issue of fact as to whether his former supervisor had acted with malice in making a written complaint about the plaintiff to their employer. (*Cruey v. Gannett Co.*, *supra*, 64 Cal.App.4th at pp. 369-370 & fns. 16, 17.) *Cruey* does not purport to make a general statement concerning the propriety of summary judgment when malice is at issue. (Accord, *Noel v. River Hills Wilsons, Inc.*, *supra*, 113 Cal.App.4th at p. 1372 [rejecting contention based on *Cruey* that summary judgment is unavailable when conditional privilege is at issue and granting summary judgment on defamation claims based on the common interest privilege].)

4. *Sachs Has Not Presented Evidence Raising a Triable Issue for the Jury as to the Individual Defendants' Malice in Making Their Communications*

As stated, the common interest privilege does not arise when a communication is made with malice. (*Brown v. Kelly Broadcasting Co.*, *supra*, 48 Cal.3d at p. 723, fn. 7.) Sachs contends she has presented sufficient evidence to prove or infer that Powers, Domingue and Davis acted with malice in sending their e-mails, thus raising a triable issue of material fact to defeat summary judgment. Specifically, she argues all of the individual defendants had prior disputes, grudges or ill feelings toward her. She argues Powers, Domingue and Bates had accused her of violating the law—abusing or neglecting children—without reasonably believing it to be true or knowing it was false.

19

Sachs maintains they did so with the intent to smear her reputation and damage her relationship with Center. Sachs further argues the defendants failed to verify facts, investigate, or interview pertinent witnesses to confirm or disprove the reported incidents, including the January 14, 2010 incident and Bates's claim that Sachs "threw a table at her."

There are several flaws in Sachs's arguments concerning the individual defendants' actions and behavior. First, Sachs's arguments in the trial court did not address these details. On the question of malice, Sachs argued below the defendants' evidence as to the lack of malice was "insufficient to support a summary judgment motion." Pointing to the fact defendants should have reported instances of child neglect to law enforcement, she argued none of the defendants "stood in relation to the recipients as to afford a reasonable ground for supposing the motive of communications to be innocent." This was the extent of her arguments below, and we need not consider new allegations or theories raised for the first time on appeal. (*Dicola v. White Bros. Performance Products, Inc.* (2008) 158 Cal.App.4th 666, 676.) To permit Sachs to do so " 'would not only be unfair to the trial court, but manifestly unjust to the opposing litigant.' " (*Ibid.*)

Further, most of Sachs's factual assertions in the argument sections of her brief are not accompanied by citations to the record. This failing would force us to review Sachs's factual background for the record evidence on which she presumably relies for each assertion, which we need not do. (*Lona v. Citibank, N.A.* (2011) 202 Cal.App.4th 89, 98, fn. 2 ["Each and every statement in a brief regarding matters that are in the record on appeal, whether factual or procedural, must be supported by a citation to the record"]; this

20

rule applies "regardless of where the reference occurs in the brief"]; *Doppes v. Bentley Motors, Inc.* (2009) 174 Cal.App.4th 967, 990; *City of Lincoln v. Barringer* (2002) 102 Cal.App.4th 1211, 1239, fn. 16.)  We may deem unsupported contentions forfeited.  (*In re S.C.* (2006) 138 Cal.App.4th 396, 406-407 [appellate court can deem a contention unsupported by a record citation to be without foundation and thus forfeited]; Cal. Rules of Court, rule 8.204(a)(1)(C) ["Each brief must . . .  [¶]  . . .  [¶]  . . . [s]upport any reference to a matter in the record by a citation to the record."].)  These deficiencies alone entitle us to disregard her arguments.

Additionally, Sachs points to the assertedly new evidence submitted in connection with her reconsideration motion as "undermin[ing]" defendants' claims.  We consider only the evidence submitted to the trial court with the parties' summary judgment papers.  (E.g., *Brosterhous v. State Bar* (1995) 12 Cal.4th 315, 325 [reviewing court generally only looks to record made in trial court]; *DiCola v. White Bros. Performance Products, Inc.*, *supra*, 158 Cal.App.4th at p. 676 [possible theories not fully developed or factually presented to the trial court cannot create a triable issue of fact on appeal of a summary judgment]; *Lewis v. City of Benicia* (2014) 224 Cal.App.4th 1519, 1532.)  " 'A party is not permitted to change his position and adopt a new and different theory on appeal.  To permit him to do so would not only be unfair to the trial court, but manifestly unjust to the opposing litigant.' "  (*DiCola*, at p. 676.)  We accordingly disregard any evidence presented in support of Sachs's failed request for reconsideration.

We likewise disregard evidence excluded by the trial court without challenge by Sachs on appeal.  (See Code Civ. Proc., § 437c, subd. (c) [appellate court considers all of

21

the evidence except that to which objections have been made and sustained by the trial court]; *Guz*, *supra*, 24 Cal.4th at p. 334.) In particular, Sachs purports to claim she presented evidence that Powers exhibited hostility toward her in that Powers told another staffer she was going to "bring [Sachs] down" before leaving for school. But the trial court excluded this evidence on various grounds, including as inadmissible double hearsay.[5] Sachs ignores this ruling on appeal and presents no argument or authority suggesting it was an abuse of discretion. (*DiCola v. White Bros. Performance Products, Inc.*, *supra*, 158 Cal.App.4th at p. 679 [appellate court reviews evidentiary rulings on summary judgment for abuse of discretion, which opposing party has the burden to establish].) We do not consider this purported evidence in deciding whether Sachs met her responsive summary judgment burden to establish malice. (*Loggins v. Kaiser Permanente Intern* (2007) 151 Cal.App.4th 1102, 1108, fn. 5.)

Finally, in arguing the issue of malice, Sachs repeatedly sets forth general legal principles about the sort of conduct that may amount to malice, without relating them to the purported facts of this case or admissible evidence. We are entitled to disregard

---

[5] The trial court's order states: "Plaintiff's responsive fact, number 1031[,] refers to an incident in which defendant Powers informed another staff member that she was going to 'bring [plaintiff] down.' The evidence supporting this statement is plaintiff's own deposition wherein she states that this incident was 'told to me,' presumably by another staff member. Plaintiff's statement constitutes inadmissible double hearsay. Though defendant's statement could be considered an admission, there is no exception for the statement made by the other, unnamed staff member. Even if this evidence was admissible, it is conclusory and no context is provided. It is not stated when this occurred and what Powers meant or intended."

22

points made in this manner. (See *DiCola v. White Bros. Performance Products, Inc.*, *supra*, 158 Cal.App.4th at p. 682.)

a. *The Evidence Does Not Permit an Inference of Malice by Reason of Ill Will, Hostility or Prior Disputes*

Sachs has not shown the evidence gives rise to malice by reason of the individual defendants' ill will, hostility or prior disputes. As to Powers, Sachs argues: "Powers had received multiple reprimands regarding her inappropriate conduct on the job from [Sachs] over the year and a half prior to the defamatory e-mail. In fact, [Sachs] had recommended Powers be replaced. Powers was not happy. Her hostility towards [Sachs] was apparent to coworkers, including Jennifer Maley. Powers also promised to take Appellant down. Powers' [*sic*] unhappiness with the reprimands and request that she be replaced was reflected in letters produced in discovery."

This argument suffers from all of the flaws outlined above. With the exception of the latter sentence, which we disregard as improperly citing to evidence presented on Sachs's reconsideration motion, Sachs provides no record support. Where we have found the portions of the record to which Sachs refers (e.g., purporting to show Sachs recommended Powers be replaced), the record does not support the assertion (see footnote 2, *ante*). Powers stated under oath that she sent her e-mail in good faith out of concern for Center's children and not out of malice, hatred or ill will; Sachs's arguments do not raise a meaningful dispute on that point or suggest Powers acted out of ill will and as a result of prior grudges or disputes.

23

The evidence as to Domingue, Bates, and Davis is similarly deficient. Sachs claims Domingue had a "documented" history of a grudge due to her July 2008 complaints, and that she felt " 'punished and her job was threatened.' " But our review of the record shows the latter point is supported only by evidence presented on reconsideration, and thus we do not consider it. Sachs points to Bates's 2009 reprimand and ensuing communication about it to McCaslin and Nelson. As for Davis, Sachs asserts only that she was "good friends" with the other defendants, who had hostility and ill will toward her.

Sachs's evidence of Domingue's or Bates's prior discipline, without more, does not give rise to an inference of personal hatred, ill will, or willingness to injure Sachs (see *White v. State of California* (1971) 17 Cal.App.3d 621, 629, quoting *Hearne v. DeYoung* (1901) 132 Cal. 357, 361-362) sufficient to raise a jury question concerning whether the individual defendants' communications concerning Sachs's work performance were made in good faith or out of malice. Sachs suggests her evidence is like that found sufficient to support malice in *Larrick v. Gilloon* (1959) 176 Cal.App.2d 408, disapproved of in *Field Research Corp. v. Superior Court* (1969) 71 Cal.2d 110, 113, and *Cruey v. Gannett Co.*, *supra*, 64 Cal.App.4th 356. But in *Cruey*, the court found evidence sufficient to overcome summary judgment where it showed the defendant accused of defamation reacted angrily when the plaintiff confronted her with negative job evaluations, telling him she "would not allow [him] to threaten her job and her family" and screaming that she "knew how to protect her job." (*Cruey*, at pp. 369-370 & fn. 17.) She then filed her written complaint with their employer *the next day*, accusing the plaintiff of, among other

24

things, performing oral sex on a prostitute at a company party and organizing a visit to a strip club. (*Id*. at pp. 369-370 & fn. 16.) And *Larrick* involves an entirely different context, where a jury found the defendant's press releases and advertisements published in newspapers accusing the plaintiff managers and directors of an irrigation district of conspiracies, collusion, bad faith and dishonesty, imposing " 'phony service charges,' " and engaging in a " 'land grab,' " among other conduct. (*Larrick v. Gilloon*, 176 Cal.App.2d at pp. 411-412.) The defendant had asserted he could give the grand jury information that would bring about the plaintiffs' indictments and removal from office. (*Id*. at pp. 411, 415.) The court rejected the defendant's argument that his publications were mere expressions of opinion, and found the record contained substantial evidence to support an inference that his statements were not mere expressions of opinions, and that he did not honestly hold such opinions. (*Id*. at pp. 415-416.)

Here, the instances of prior discipline are remote, and there is no evidence that either Domingue or Bates reacted harshly to Sachs or harbored negative feelings toward her that continued into 2010. Sachs's unsupported assertions concerning Davis's friendship with the other defendants simply do not give rise to any reasonable inference of malice. Inferences based on speculation, guesswork or conjecture cannot defeat summary judgment. (*Horn v. Cushman & Wakefield Western, Inc.* (1999) 72 Cal.App.4th 798, 807; *Joseph E. DiLoreto, Inc. v. O'Neill* (1991) 1 Cal.App.4th 149, 161.) We conclude the evidence does not raise a reasonable inference of malice based on ill will or prior disputes so to preclude summary judgment.

25

b. *The Evidence Does Not Permit an Inference of Malice Arising from Improper Motives or Knowledge of Falsity*

Sachs argues she presented evidence the defendants acted out of improper motivations; that if they truly believed Sachs was neglecting children she (or the persons receiving the e-mails) would have reported the matter to law enforcement or the County of San Diego, and if they were handling a workplace dispute, they would have followed Center procedures contained in the employee handbook. She asserts this permits a reasonable inference the defendants did not reasonably believe the truth of their accusations. Sachs also argues all of the defendants "recanted" their accusations in their depositions. The latter assertion is not supported by record citations, or, for that matter, the summary judgment record.[6]

The question is whether Sachs's evidence raises a triable issue of fact for the jury that the defendants "lacked reasonable grounds for belief in the truth of [their] publication[s] and therefore acted in reckless disregard of [Sachs's] rights." (*Roemer v. Retail Credit Co.* (1975) 44 Cal.App.3d 926, 936; in part citing *MacLeod v. Tribune*

---

[6] Sachs refers to the deposition of Bates, which is not included in the record. Though excepts from Nelson's deposition are in the record, Sachs's cited to pages that are not included. As for Wilkerson-Howard, she did not purport to recant her prior statements in her deposition. Rather, Wilkerson-Howard explained she was complaining about the indirect neglect of children resulting from Sachs's poor treatment of Center staff and its consequences. Powers asserted in her deposition that she had not seen Sachs neglect children within the meaning of the Penal Code. But Powers also explained she had never reported that Sachs had neglected children in the first place. In fact, none of the statements made in Powers's January 29, 2010 e-mail concerning Center's clients (see footnote 3, *ante*) suggest Sachs was committing neglect as that term is defined within the Penal Code (see footnote 7, *post*).

*Publishing Co.* (1959) 52 Cal.2d 536, 552; see also *McGrory v. Applied Signal Technology, Inc.*, *supra*, 212 Cal.App.4th at p. 1540.)  The premise of Sachs's argument concerning the individual defendants' unreasonable belief in the truth of their complaints is that each defendant failed to report a claim of suspected child abuse or neglect in violation of asserted obligations under Penal Code section 11165.7.  But neglect for purposes of that law is particularly defined,[7] and the defendants' complaints, viewed in the context of their e-mails and in light of Sachs's job duties, are not reasonably construed as complaints of severe or general neglect within the meaning of that law.  And, as stated, each individual defendant disavowed any improper motive or falsity in sending her e-mail communications about Sachs to Center's management.  (Accord, *Cuenca v. Safeway San Francisco Employees Fed. Credit Union*, *supra*, 180 Cal.App.3d at p. 998.)  Even viewing the admissible evidence in the light most favorable to Sachs, we conclude a trier of fact cannot reasonably infer defendants' complaints were made recklessly or without reasonable belief in their truth.

---

[7]     Penal Code section 11165.2 provides that " 'neglect' means the negligent treatment or the maltreatment of a child by a person responsible for the child's welfare under circumstances indicating harm or threatened harm to the child's health or welfare" and includes both acts and omissions.  (Pen. Code, § 11165.2.)  The statute defines both severe and general neglect.  (*Id*. at subds. (a) & (b).)  Severe neglect is "the negligent failure of a person having the care or custody of a child to protect the child from severe malnutrition or medically diagnosed nonorganic failure to thrive" and "those situations of neglect where any person having the care or custody of a child willfully causes or permits the person or health of the child to be placed in a situation such that his or her person or health is endangered . . . including the intentional failure to provide adequate food, clothing, shelter, or medical care."  (Pen. Code, § 11165.2, subd. (a).)  General neglect is "the negligent failure of a child care provider to provide adequate food, clothing, shelter, medical care or supervision where no physical injury to the child has occurred."  (Pen. Code, § 11165.2, subd. (b); see also Cal. Code Regs., tit. 11, § 930.30, subd. (b)(1).)

27

### c. *Claim of Failure to Reasonably Investigate*

Sachs contends she has raised a triable issue of fact as to malice stemming from the individual defendants' failure to verify facts before sending their e-mails, and Center's failure to interview "obvious witnesses" or consult "relevant documentary sources," as well as its reliance on sources "knowingly hostile" to her in deciding to terminate her. She maintains there are numerous examples of these failures. According to Sachs, McCaslin and Nelson should have been suspicious of the complaints because of the individuals' prior discipline by Sachs, but rather than following Center's internal policies regarding complaints by employees, McCaslin summarily terminated her.

Sachs relies on evidence, including the serious incident reports, that was not before the trial court when it considered defendants' summary judgment motion. Indeed, with the exception of one unhelpful reference to a bates stamp, all of her assertions are made without record support. For that reason alone, Sachs has not demonstrated a triable issue of fact as to malice on a theory of any particular defendant's insufficient investigation.

Sachs's claims are unavailing on the merits in any event. The law is clear, including by Sachs's own cited authorities, that "failure to investigate will not alone support a finding of actual malice . . . ." (*Harte-Hanks Communications, Inc. v. Connaughton* (1989) 491 U.S. 657, 692; and see *Annette F. v. Sharon S.* (2004) 119 Cal.App.4th 1146, 1169 [mere failure to investigate the truthfulness of a statement, even when a reasonably prudent person would have done so, is insufficient to demonstrate actual malice].) There must be some showing of "purposeful avoidance of the truth" or a

28

party's inaction "was a product of a deliberate decision not to acquire knowledge of facts that might confirm the probable falsity of [the] charges." (*Harte-Hanks*, at p. 692; *Antonovich v. Superior Court* (1991) 234 Cal.App.3d 1041, 1048; see also *Rosenaur v. Scherer* (2001) 88 Cal.App.4th 260, 277.) When a case involves the republication of a third party's defamatory falsehoods, " 'failure to investigate before publishing, even when a reasonably prudent person would have done so, is not sufficient.' " (*Khawar v. Globe Intern., Inc.* (1998) 19 Cal.4th 254, 275-276.)

Here, defendants presented evidence that McCaslin did in fact investigate the claims against Sachs; he visited the Discovery Hills campus in November 2009 and observed Sachs's hostile treatment of staff. He spoke with Bates and met personally with Powers. Bates's claim concerning Sachs pushing a table at her was documented in Bates's own contemporaneous handwritten notes, which cover incidents occurring over the course of three months in late 2010 through early 2011. Nothing in McCaslin's July 2010 declaration, relied upon by Sachs as somehow establishing different reasons for his termination decision, contradicts this evidence.[8] In any event, McCaslin gave an independent reason for Sachs's termination, which was Sachs's incompetent performance of her job duties particularly in preparing RFPs, and lack of knowledge about her own

---

[8] In his July 2010 declaration, McCaslin states: "I, along with . . . Nelson conducted an investigation into Ms. Sachs' [*sic*] treatment of children, employees and attention to her duties. We reviewed employee letters, e-mails, and spoke with employees. Our investigation revealed that Ms. Sachs, for over two years, had been neglecting children, employees and her [Center] duties."

29

program, all of which was personally observed and attested to by Wilkerson-Howard in support of the motion.

Unlike the cases Sachs relies on for her general propositions, Sachs does not explain what about these circumstances should have suggested to McCaslin or any other center employee that "obvious" witnesses or documents would have confirmed or disproved the e-mails' allegations or Bates's claims. (See, e.g., *Harte-Hanks Communications, Inc. v. Connaughton*, *supra*, 491 U.S. at pp. 682, 692 [defendant newspaper instructed reporters to interview all witnesses to an alleged defamatory conversation except Patsy Stephens, who the defendant knew was a "key witness," "the one witness who was most likely to confirm [the publisher's] account of the events," and whose denial "would quickly put an end to the story"; defendant also decided not to listen to tapes of Stephens's interview which would have verified or disproved what the publisher said about the interview]; *Khawar v. Globe Intern., Inc.*, *supra*, 19 Cal.4th at p. 277 [defendant's editors did not contact eyewitnesses to Robert Kennedy assassination about which defamatory accusations were made, including "prominent individuals who could easily have been located"; nor did anyone review the voluminous public records of the government investigation, and defendant's managing editor "conceded . . . that Globe made no attempt to independently investigate the truth of any of the statements in the . . . book"].) The information obtained by McCaslin and Nelson was consistent with earlier 2008 complaints about Sachs's conduct and supported by personal observations of Powers, Domingue, Davis and Bates, and other sources within Center who Sachs could identify via discovery. In their summary judgment declarations, each defendant stated

30

they personally interacted with Sachs, and their observations of her mismanagement and behavior were based on their personal knowledge.[9] As for Powers's listing of events, she stated they were based primarily on her personal observations, and otherwise were based on credible and verified reports from staff who had reported the matter to her. Sachs has not demonstrated that the information was based on unverifiable anonymous sources, nor has she presented evidence allowing some inference that their stories could have been contradicted by a particular person or document. There is no evidence similar to the authorities cited by Sachs either supporting a jury finding, or permitting an inference, of malice.

Accordingly, we cannot reasonably infer that McCaslin or any other Center employee ignored information that would have rebutted the January 2010 e-mails or Bates's complaints. The evidence as a whole, even circumstantially, does not allow an inference that there were " 'obvious reasons to doubt the veracity of [the statements of Bates, Davis, Domingue and Powers] or the accuracy of [their] reports . . .' " (*Khawar v. Globe Intern., Inc.*, *supra*, 19 Cal.4th at p. 276.)

---

9    Bates states she "personally interacted with [Sachs] on a daily basis"; "observed Ms. Sachs delegate many of her program manager responsibilities to me including helping to prepare the Discovery Hills Program request for proposal"; and all of her notes regarding Sachs "were true and based on my personal observations in good faith . . ." Davis states: "I wrote an email and sent it only to . . . Nelson and . . . McCaslin concerning a January 27, 2010 incident I personally witnessed involving . . . Sachs and a client." Domingue states that the "content of my email was entirely true as I personally observed Ms Sachs' [*sic*] conduct." Powers states she "personally observed Ms. Sachs [*sic*] lack of supervision for both the children's program . . . and the adolescents' program"; "personally observed Ms. Sachs' [*sic*] neglect of children clients, families, employees and her [Center] duties"; and "personally observed Ms. Sachs' [*sic*] violate company policy and procedures on numerous occasions."

31

d. *Failure to Disclose "Exculpatory" Evidence*

Citing *Parrott v. Bank of America Nat. Trust & Savings Assn.* (1950) 97 Cal.App.2d 14 and *Stationers Corp. v. Dun & Bradstreet* (1965) 62 Cal.2d 412, 420-421 (*Stationers Corp.*), Sachs contends malice should be inferred from defendants' failure to disclose exculpatory information—the serious incident reports—or their refusal to disclose the sources of defamatory information.

We disregard Sachs's references to the serious incident reports submitted in connection with her reconsideration motion. Otherwise, Sachs maintains Center "failed to disclose the fact that McCaslin claims to have told Wilkerson well in advance of the firing that he wanted to get rid of [Sachs], but they both wanted to keep her on staff long enough to deceive the County . . . in approving their $5M funding request." She argues Wilkerson-Howard did not disclose the statements made in her January 20, 2010 e-mail, which Center did not include in her employment file. Sachs finally argues both Powers and Domingue did not disclose the sources of their information in their e-mails.

The sole matter cited by Sachs for her claim about McCaslin is a snippet from this court's prior decision concerning defendants' section 425.16 anti-SLAPP motion, in which we summarized defendant's arguments about the January 2010 e-mails being matters of public concern. (*Sachs v. San Diego Center for Children* (Dec. 2, 2011, D058477) [nonpub. opn.].) Nothing in those few sentences from our prior opinion supports Sachs's assertion. To the extent Sachs is claiming that McCaslin withheld his true reasons for her termination, Sachs and her counsel had possession of his July 2010 declaration from which she apparently gleans that conclusion. As for Powers and

32

Domingue, as we have pointed out, each stated under oath the observations about Sachs contained in their e-mails were true and based either entirely or primarily on their personal observations.

Sachs's cited authorities are irrelevant, inapposite and do not stand for her asserted proposition. In *Parrott v. Bank of America Nat. Trust & Savings Assn.*, *supra*, 97 Cal.App.2d 14 a jury awarded the plaintiff damages on her claim of false imprisonment and wrongful discharge after she was wrongly accused of stealing a deposit. (*Id*. at p. 16.) At the page cited by Sachs, the appellant bank claimed the court erred by admitting evidence as to posttermination acts suggesting oppression, fraud or malice for purposes of a jury award of punitive damages; the appellate court held the jury could reasonably infer malice from the letters sent by the bank and bank's other actions in dealing with the plaintiff after her employment was terminated. (*Id*. at p. 25.) The case does not involve the section 47, subdivision (c) privilege or contain any discussion concerning nondisclosure of exculpatory information as permitting an inference of malice.

*Stationers Corp.*, *supra*, 62 Cal.2d 412, turns on its unique facts. There, plaintiffs sued a merchantile agency for defamation, libel and negligence stemming from a report and letter issued by the defendants describing litigation filed against the plaintiff. The report stated the action had alleged the managers fraudulently appropriated corporate assets, and stated there were "authorities" who opined the suit had "considerable merit" and potential to bring about the removal of a top manager. (*Id*. at pp. 414-416.) The defendant moved for summary judgment on grounds the publications were privileged under section 47, subdivision (c) and submitted declarations from three employees, one

33

of whom stated he had spoken with and relied in good faith on the statements of four unidentified credit managers who he believed to be reliable and truthful. (*Id*. at pp. 417-419.) In a counter declaration, the plaintiff stated he could not deny or offer evidence rebutting those assertions without the identities of the credit managers, which he had tried to obtain from the defendant. (*Id*. at p. 419.) Liberally construing the plaintiff's declaration, the California Supreme Court stated the plaintiff "in effect claimed that defendants' refusal to disclose the names prevented plaintiffs from contravening [the declarant's] assertion of good faith reliance on the statements of the credit managers." (*Id*. at p. 421.) Thus, the court held that under settled principles summary judgment had been improperly granted; defendants had made an "*ipse dixit* assertion of good faith" and it would be unjust for a defendant to raise the qualified privilege without requiring him to disclose information in his possession necessary to determine whether the statements were made without malice. (*Id*. at pp. 420-421.) The court further rejected the defendants' argument that their declarations were uncontroverted: "Defendants cannot assert with propriety that the declarations opposing the motion are insufficient, when the insufficiency is compelled by their own evasion." (*Id*. at p. 421.)

*Stationers Corp*., *supra*, 62 Cal.2d 412, addresses the respective moving and opposing summary judgment burdens, it does not hold that malice, for purposes of the section 47, subdivision (c) privilege, may be inferred by the failure to disclose information. More importantly, unlike the plaintiff in *Stationers Corp*., Sachs does not claim she was unable to meaningfully oppose defendants' summary judgment motion, or that she had tried, but was unable, to ascertain the identity of any complaining person

34

during discovery. Indeed, Sachs disputes the truth of the January 2010 e-mails in her declaration opposing the motion. The evidence shows the individual defendants either complained about Sachs's own conduct from their own firsthand knowledge or relied on reports of other Center employees with whom Sachs interacted. Thus, the circumstances are entirely unlike those in *Stationers Corp.*, because the complaints pertain to Sachs's own conduct, which she is capable of admitting or denying.

C. *Cause of Action Against Center for Breach of the Covenant of Good Faith and Fair Dealing*

Sachs contends Center was not entitled to summary judgment on her cause of action for breach of the implied covenant of good faith and fair dealing; that she has demonstrated the existence of triable issues of material fact as to whether Center breached the implied covenant. Specifically, Sachs argues Center admitted that a contract existed and that she "performed all of the significant things that the contract required and received acknowledgement of this in all contemporaneous official business documentation, employment reviews, and SDCC funding requests to third parties." She argues Center "unfairly interfered with her continued employ without following the procedures set forth in the Employment Manual, without advising her of three complaining e-mails sent within the last two weeks before her summary firing, and by failing to investigate complaints about her conduct." She further argues Center "unfairly interfered with [her] right to receive the benefits of the contract" by accepting defendants' e-mails at face value and not investigating their truth. Sachs argues Center's breach harmed her in that she lost her job and associated income, was unable to find replacement

35

work because Center did not provide a reference letter, and had her credentials used "unwittingly" so that Center could obtain funding. As with Sachs's other arguments, her assertions are not supported by any citation to the record, and on the latter point, Sachs refers us to other sections of her brief to find the details of these failings.

We nevertheless conclude Sachs has not demonstrated the existence of triable issues of material fact as to whether Center breached the implied covenant of good faith and fair dealing. A covenant of good faith and fair dealing is implied in every contract " ' " 'that neither party will do anything [that] will injure the right of the other to receive the benefits of the agreement.' " ' " (*Agosta v. Astor* (2004) 120 Cal.App.4th 596, 607-608.) The implied covenant of good faith and fair dealing cannot, however, "impose substantive terms and conditions beyond those to which the contract parties actually agreed." (*Guz*, *supra*, 24 Cal.4th at pp. 349.) It "exists merely to prevent one contracting party from unfairly frustrating the other party's right to receive the *benefits of the agreement actually made*." (*Ibid*; see also *Racine & Laramie, Ltd. v. Department of Parks & Recreation* (1992) 11 Cal.App.4th 1026, 1032 [there is no obligation to deal fairly or in good faith absent an existing contract].) "Thus if the employer's termination decisions, however arbitrary, do not breach . . . a substantive contract provision, they are not precluded by the covenant." (*Guz*, at p. 350.)

Sachs's conclusory and unsupported assertions make clear that her complaint is that Center wrongfully or in bad faith terminated her employment. We observe that in the statement of facts section of her brief, Sachs states she "worked under contract with [Center] for almost four years" and that all of the individual defendants were aware of

36

this contract. As support, Sachs cites to Center's response to a form interrogatory asking whether Sachs's employment relationship was governed by any written, oral or implied agreement, to which Center answered yes, and stated that Sachs had "agreed to abide by various policies which were contained in [her] employment file" and she "signed acknowledging her employment relationship with [Center] was 'at will' and could be terminated by herself or [Center], at any time, for any reason, so long as the reason was not unlawful." Sachs's evidence merely shows that Center admitted in discovery that Sachs's employment was expressly at will.

An express agreement for at will employment precludes a claim for breach of the covenant of good faith and fair dealing, as well as any other breach of implied contract. (*Guz*, *supra*, 24 Cal.4th at pp. 340 & fn. 10, 350-352; *Agosta v. Astor*, *supra*, 120 Cal.App.4th at pp. 604 [express at will contract by definition allows an employer to sever the employment relationship with or without cause], 607-608; *Starzynski v. Capital Public Radio, Inc.* (2001) 88 Cal.App.4th 33, 38-39; see also *Cruey v. Gannett Co.*, *supra*, 64 Cal.App.4th at p. 365 ["Cruey's failure to generate a triable issue as to an implied-in-fact agreement not to terminate except for good cause, which is sufficient to overcome a contrary express provision, moots any need to examine whether Gannett acted in good faith when it terminated Cruey."].)

In her summary judgment opposition, Sachs did not dispute the fact she signed documents expressly acknowledging and agreeing her employment was at will. Sachs testified in her deposition she understood her employment was terminable at will. Her claims are largely identical to those made by the plaintiff and rejected in *Guz*, who

37

asserted his former employer "violated its established personnel policies when it terminated him without a prior opportunity to improve his 'unsatisfactory' performance" and that, even if his employment was at will, the implied covenant "precluded [his employer] from 'unfairly' denying him the contract's benefits by failing to follow its own termination policies." (*Guz*, *supra*, 24 Cal.4th at pp. 348-349.) Any other possible remedy arising from Center's personnel policies and practices may be contractual (*id*. at pp. 352-353), but Sachs does not assert a claim for breach of contract. Thus, the undisputed nature of Sachs's at will employment defeats Sachs's cause of action, warranting summary judgment on this claim.

D. *Cause of Action for Intentional Interference with Contract Against the Individual Defendants*

In order to prevail on a claim for intentional interference with contract, Sachs must prove the existence of a valid, enforceable contract between her and Center. (*Hahn v. Diaz-Barba* (2011) 194 Cal.App.4th 1177, 1196; *Tuchscher v. Development Enterprises, Inc. v. San Diego Unified Port Dist.* (2003) 106 Cal.App.4th 1219, 1239; *Bed, Bath & Beyond of La Jolla, Inc. v. La Jolla Village Square Venture Partners* (1997) 52 Cal.App.4th 867, 879.) In addressing this cause of action, Sachs acknowledges, as she must, that her agreement with Center was for at will employment. Citing *Pacific Gas & Electric Co. v. Bear Stearns & Co.* (1990) 50 Cal.3d 1118, she argues that interference with an at-will contract is actionable interference "on the theory that a contract ' "at the will of the parties, respectively does not make it one at the will of others." ' " (*Id*. at p. 1127.) She maintains that "[c]ircumstantial evidence demonstrates that [defendants']

38

actions were not directed towards resolution of problems with Appellant, but rather to disrupt her employment relationship with [Center]."

Having reviewed the summary judgment evidence, we have not found anything rebutting each of the individual defendants' sworn statements that they were not aware any contract existed between Sachs and Center, and did not intend to breach any contract. Sachs's evidence (Center's discovery admission) does not establish an underlying enforceable contract of employment, it merely shows she and Center had an at will employment arrangement. Where "the undisputed facts negate the existence . . . of the contract claimed, summary judgment is proper." (*Guz*, *supra*, 24 Cal.4th at p. 337.)[10]

---

10     There is another reason why Sachs's claim fails. Even presuming the existence of some contract of employment, the California Supreme Court has rejected claims for alleged interference of an employment contract by managers and coemployees acting within the course and scope of their employment to protect the employer's interest. "It is . . . well established that corporate agents and employees acting for and on behalf of a corporation cannot be held liable for inducing a breach of the corporation's contract." (*Shoemaker v. Myers* (1990) 52 Cal.3d 1, 24; *Mintz v. Blue Cross of California* (2009) 172 Cal.App.4th 1594, 1604). In *Shoemaker v. Myers*, a terminated public employee sought to claim wrongful interference with a business relationship and wrongful inducement of breach of contract against various directors and officers of the department for which he worked. (*Id.* at pp. 7-11 & fn 2.) The supervisors were authorized to terminate his employment and were acting on the employer's behalf. (*Id.* at p. 25.) Although Shoemaker did not have a contract of employment to be breached because he was a public employee (*id.* at pp. 23-24), the court concluded that the department's officers stood "in the place of the employer" and the department could not "act except through such agents," thus there was "no viable 'inducement of breach of contract' or 'interference with economic advantage' that [was] distinguishable from a cause of action for breach of contract." (*Id.* at p. 25.) Here, Sachs has not claimed any of the individual defendants were acting outside the scope of their duties or employment, or that they were not authorized to communicate their complaints concerning Sachs. She does not rebut their claims that they were acting in the interests of Center's clients.

E. *Cause of Action for Intentional Interference with Prospective Economic Relations*

Sachs contends she raised evidence showing she had an economic relationship with Center, and that the individual defendants were attempting to disrupt the relationship. She claims Bates "secretly went outside of proper procedures to secretly complain to McCaslin about [Sachs]" and the other defendants "secretly sent emails to [Sachs's] superiors also outside of proper procedures and without notifying [Sachs]." She states defendants "intended to disrupt, if not terminate, Appellant relationship [*sic*] with [Center], and succeeded."

To prevail on a cause of action for interference with prospective economic advantage, Sachs has the burden of proving not only that defendants knowingly or negligently interfered with an economic relationship, but that they engaged in conduct that was wrongful by some legal measure other than the fact of interference itself. (*Tuchscher Development Enterprises, Inc. v. San Diego Unified Port Dist*., *supra*, 106 Cal.App.4th at p. 1242.)

Sachs does not explain with any authority or reasoned analysis how any of the asserted interference she describes was wrongful by some legal measure. And she has described no "prospective economic advantage" other than the continuation of the employment relationship. (Accord, *Shoemaker v. Myers*, *supra*, 52 Cal.3d at p. 24.) Sachs makes clear that the gravamen of this cause of action is defendants' interference causing the disruption or termination of her employment with Center. Thus, the claim is identical in substance to her claim for inducing breach of contract, on which she has shown no triable issue of material fact that would defeat summary judgment.

40

### III. *Motion and Cross-Motion for Sanctions*

Defendants and Sachs have each moved for sanctions. Defendants point to the procedural and other deficiencies in Sachs's briefing, as well as the trial court's prior imposition of sanctions against Sachs for her refusal to withdraw various subpoenas her counsel issued. They argue Sachs's appeal is frivolous and taken to delay her payment of over $20,000 in prevailing party costs, and they request monetary sanctions of $43,115 in attorney fees and costs to respond to Sachs's opening brief. Alternatively, they ask for an award of $11,305 for extra work performed stemming from Sachs's rule of court violations.

For her part, Sachs seeks $9,510 in sanctions for her counsel's 31.7 hours spent in opposing defendants' sanctions motion. She argues defendant's motion is a frivolous attempt to "extort settlement terms" and, because it repeats their claims about her procedural violations, constitutes an impermissible surreply brief. She asserts defendants have improperly introduced new matter into the record (the motion regarding subpoenas) that is not reasonably material to the appeal's determination. In a sworn declaration supporting the motion, Sachs's counsel summarizes e-mails and letters pertaining to the parties' settlement discussions, and claims defendants' counsel threatened to file their sanctions motion in the event Sachs did not agree to newly inserted settlement terms. Sachs's counsel's declaration is argumentative, and purports to set out facts (such as testimony occurring in pending litigation) about which she has not shown personal knowledge. Defendants oppose Sachs's sanctions motion in part on grounds it was not timely filed within 10 days after her reply brief was due (Cal. Rules of Court, rule

41

8.276(b)(2)) and is based on inadmissible mediation and settlement communications. (Evid. Code, §§ 1119, 1126, 1152, 1154).

We decline to award sanctions. An appeal should be deemed frivolous " 'only when it is prosecuted for an improper motive—to harass the respondent or delay the effect of an adverse judgment—or when it indisputably has no merit—when any reasonable attorney would agree that the appeal is totally and completely without merit.' " (*In re Reno* (2012) 55 Cal.4th 428, 513, italics omitted; *In re Marriage of Flaherty* (1982) 31 Cal.3d 637, 650.) " '[A]ny definition [of a frivolous appeal] must be read so as to avoid a serious chilling effect on the assertion of litigants' rights on appeal. Counsel and their clients have a right to present issues that are arguably correct, even if it is extremely unlikely that they will win on appeal. An appeal that is simply without merit is *not* by definition frivolous and should not incur sanctions. Counsel should not be deterred from filing such appeals out of a fear of reprisals. . . . In reviewing the dangers inherent in any attempt to define frivolous appeals, . . . courts cannot be "blind to the obvious: the borderline between a frivolous appeal and one which simply has no merit is vague indeed . . . . The difficulty of drawing the line simply points up an essential corollary to the power to dismiss frivolous appeals: that in all but the clearest cases it should not be used." [Citation.] The same may be said about the power to punish attorneys for prosecuting frivolous appeals: the punishment should be used most sparingly to deter only the most egregious conduct.' " (*In re Reno*, at p. 513.)

Though Sachs's briefing was far from a model of good appellate practice, we cannot say every position taken by her was so wrong that any reasonable attorney would

42

agree her appeal is indisputably without merit. Defendants have not presented evidence that Sachs has taken this appeal for an improper purpose, i.e., to delay some order requiring her to pay money to defendants. The sanctions order to which they refer, issued in July 2012, required Sachs to pay $2,400 in sanctions "within two weeks of this hearing." There is no evidence Sachs failed to satisfy this order or it was somehow stayed by this appeal. Indeed, in response, Sachs's counsel states under oath that those sanctions "have long ago been paid." Further, defendants' assertions concerning the approximately $20,000 cost award are not addressed in the attorney declaration supporting their sanctions motion.

As for Sachs's cross-motion for sanctions, we conclude, regardless of its timeliness, she has not shown with admissible evidence that defendants' sanctions motion was brought for improper motives. Nor, in view of Sachs's procedural and substantive failings, including her reliance upon evidence outside the summary judgment record, has she demonstrated the motion is totally without merit. We accordingly deny the parties' sanctions motions.

DISPOSITION

The judgment is affirmed.  The motions for sanctions are denied.  The parties are to bear their own costs on appeal.


                                                            O'ROURKE, J.

WE CONCUR:


HUFFMAN, Acting P. J.


McDONALD, J.